## GROOM v. WRIGHT.

No. 1380.    Opinion Filed January 9, 1912.

(121 Pac. 215.)

1. **INDIANS—Rent of Homestead—Renewal.** Under the provisions. of sec. 17 of Creek Supplemental Agreement, approved June 30, 1902 (32 Stat. L. 504, c. 1323), a Creek citizen may rent his homestead allotment for a period of five years for agricultural purposes, but without any stipulation or obligation to renew the same.

2. **SAME—Lease of Allotment—Validity.** Sec. 16 of the foregoing agreement, providing that the homestead of citizen allottees shall be and remain nontaxable, inalienable, and free from any incumbrance whatever for twenty-one years from date of deed therefor, is subject to the permissive provisions of sec. 17 following, expressly authorizing Creek citizens to rent their allotments for a period not to exceed five years for agricultural purposes.

3. **STATUTES—Construction.** Where it is apparent that a strict construction of a particular statute would defeat the main purpose and object of another provision of the statute, and of other legislative enactments which relate to the same subject, and which have been enacted in pursuance of and according to a general purpose of accomplishing a particular result, such interpretation should not be applied, as it would be absurd to say that the lawmakers designed to secure a result which would be antagonistic to their plain and clear intention.

(Syllabus by Sharp, C.)

*Error from District Court, Creek County; W. L. Barnum, Judge.*

Action of ejectment by Lemuel D. Groom against James Wright. Judgment for defendant, and plaintiff brings error. Affirmed.

*W. L. Cheatham,* for plaintiff in error.

*Thompson & Smith,* for defendant in error.

Opinion by SHARP, C.    This case was tried on the following agreed statement of facts:

"It is hereby agreed by and between the plaintiff and the defendant in the above-entitled action that the facts in this cause

are hereinafter stated, and that this cause shall be submitted and heard by the court upon the following statement of facts:

"(1) That Ben Sharper, mentioned in the petition and answer herein as the allottee of the lands described in the petition, is a freedman citizen of the Creek Nation of Indians. (2) That the lands described in the petition, to wit, southeast quarter of the southwest quarter of section 27, township 16 north, range 9 east, in Creek county, Okla., is the homestead allotment of said Ben Sharper, as such freedman citizen. (3) That on the 22d day of June, 1908, the said Ben Sharper executed and delivered to the defendant herein a lease upon said lands for agricultural purposes for a period of five years from said 22d day of June, 1908, and that said lease was duly acknowledged and placed of record in the office of the recorder of deeds for Creek county, Okla., at Sapulpa, in said state and county, on or about the 25th day of June, 1908, and prior to the 25th day of July, 1908. (4) That the defendant entered into possession of said land under said lease on the 22d day of June, 1908, and has been in possession of said land thereunder ever since that date. (5) That the said Ben Sharper, as such freedman citizen, did on the 28th day of July, 1908, execute and deliver to the plaintiff herein a warranty deed conveying to the plaintiff the fee-simple title of said land, and that said deed was duly acknowledged and recorded in the office of the register of deeds. (6) That the defendant, upon the delivery of said lease to him as aforesaid, paid in advance the rents as provided therein for the full period of said lease. (7) That the rental value of said land per annum is the sum of $50."

The sole question presented is that of the right of a Creek freedman, or citizen of the Creek Nation, on January 22, 1908, to execute a five-year lease to his homestead for agricultural purposes. The trial court held such a lease valid, and denied the plaintiff the relief sought. The question turns upon the proper construction to be given to sections 16 and 17 of the Act of Congress of June 30, 1902 (32 Stat. L. 503, 504), known as the "Creek Supplemental Agreement." These sections are as follows:

"Sec. 16. Land allotted to citizens shall not in any manner whatever, or at any time, be incumbered, taken, or sold to secure or satisfy any debt or obligation nor be alienated by the allottee or his heirs before the expiration of five years from the date of the approval of this supplemental agreement, except with the approval of the Secretary of the Interior. Each citizen shall

select from his allotment forty acres of land, or a quarter of a quarter section, as a homestead, which shall be and remain nontaxable, inalienable, and free from any incumbrance whatever for twenty-one years from the date of the deed therefor, and a separate deed shall be issued to each allottee for his homestead, in which this condition shall appear. Selections of homesteads for minors, prisoners, convicts, incompetents, and aged and infirm persons, who cannot select for themselves, may be made in the manner provided for the selection of their allotments, and if for any reason such selection be not made for any citizen it shall be the duty of said commission to make selection for him. The homestead of each citizen shall remain, after the death of the allottee, for the use and support of children born to him after May 25, 1901, but if he have no such issue then he may dispose of his homestead by will, free from the limitations herein imposed, and if this be not done the land embraced in his homestead shall descend to his heirs, free from such limitation, according to the laws of descent herein otherwise prescribed. Any agreement or conveyance of any kind or character violative of any of the provisions of this paragraph shall be absolutely void and not susceptible of ratification in any manner, and no rule of estoppel shall ever prevent the assertion of its invalidity.

"Sec. 17. Section 37 of the agreement ratified by said Act of March 1, 1901, is amended, and as so amended is re-enacted to read as follows: Creek citizens may rent their allotments, for strictly nonmineral purposes, for a term not to exceed one year for grazing purposes only and for a period not to exceed five years for agricultural purposes, but without any stipulation or obligation to renew the same. Such leases for a period longer than one year for grazing purposes and for a period longer than five years for agricultural purposes, and leases for mineral purposes may also be made with the approval of the Secretary of the Interior, and not otherwise. Any agreement or lease of any kind or character violative of this paragraph shall be absolutely void and not susceptible of ratification in any manner, and no rule of estoppel shall ever prevent the assertion of its invalidity. Cattle grazed upon leased allotments shall not be liable to any tribal tax, but when cattle are introduced into the Creek Nation and grazed on lands not selected for allotment by citizens, the Secretary of the Interior shall collect from the owners thereof a reasonable grazing tax for the benefit of the tribe, and section 2117 of the Revised Statutes of the United States shall not hereafter apply to Creek lands."

These sections of the supplemental treaty superseded and worked the repeal of sections 7 and 37 of the Act of March 1, 1901, c. 676, 31 Stat. 863, 871, known as the "original treaty with the Creek Indians." *Eldred et al.. v. Okmulgee Loan & Trust Co.,* 22 Okla. 742, 98 Pac. 929. And the consideration of these provisions of the original treaty is therefore rendered unnecessary, except in so far as it may aid in the proper construction of like provisions of the latter act.

All the transactions necessary to a consideration of this case happened subsequently to the passage of the supplemental treaty. Standing alone, little difficulty would be met in construing section 17, which, by its own terms, expressly makes and re-enacts section 37 of the original treaty. It plainly provides that Creek citizens may rent their allotments for strictly nonmineral purposes for a term not to exceed one year for grazing purposes only, and not to exceed five years for agricultural purposes, but without any stipulation or obligation to renew the same. Leases for mineral purposes may also be made with the approval of the Secretary of the Interior, and not otherwise. It is provided that agricultural leases for a period longer than five years and grazing leases for longer than one year may be made with the approval of the Secretary of the Interior, and not otherwise. By section 16 of the latter treaty, heretofore quoted, Congress restricted the alienation of lands of allottees and their heirs for certain periods of time (*Tiger v. Western Investment Co.,* 221 U. S. 286, 31 Sup. Ct. 578, 55 L. Ed. 738; *Moore v. Sawyer* [C. C.] 167 Fed. 826); while section 17, as already shown, had to do with the renting of allotments. The exact question presented has never before received the consideration of this court. In *Williams et al. v. Williams,* 22 Okla. 672, 98 Pac. 909, it was held that under the provisions of section 17, *supra,* a Creek citizen had the right to lease his allotment for agricultural purposes for a period of five years; but it does not appear that the lands leased involved the homestead. In *Muskogee Land Company v. Mullens,* 165 Fed. 179, 91 C. C. A. 213, the Circuit Court of Appeals said:

"The act of Congress, which alone authorizes any lease of the land of Creek citizens, prohibited leasing for grazing purposes for terms in excess of one year," etc.

But it does not appear in this case that the homestead was involved.

In *Moore v. Sawyer* (C. C.) 167 Fed. 826, referring to section 16 of the supplemental agreement, the court said:

"This is the only section of the act placing restrictions upon the disposition of their lands by allottees. Then follows section 17, providing that citizens. may rent their allotments upon certain terms and conditions. This express permission to rent clearly implies that but for such permission the right to rent or lease would not exist. But why would it otherwise not exist? Clearly, only because of the sweeping restriction upon alienation contained in the preceding section. *. * * It follows that if the restrictions imposed by section 16 comprehended the renting or leasing, making the permissive clause of section 17 necessary, then the repeal of section 16 by the act of April 21, 1904 [Act April 21, 1904, c. 1402, 33 Stat. 189], gave those affected by the act the same right to lease as to otherwise alienate. Such, in my opinion, is a fair and reasonable construction of the legislation."

In this case, we must presume that the homestead was not involved, as the court there held that the passage of the act of April 21, 1904, repealed section 16, *supra.* The court could properly not have thus concluded, had the homestead been involved, for the last-mentioned act expressly excepts homesteads from its operation. In *Eldred et al. v. Okmulgee Loan & Trust Co.,* it was said:

"Is, then, a lease an 'alienation,' within the intent and meaning of that act (referring to the supplemental treaty)? * * * It is apparent that the term 'lease,' as contained in said treaties, is not used in the sense of an incumbrance, nor intended to be comprehended by that term; but the question here for our determination is whether a lease is a species of alienation. We think so, and that it was so considered by Congress. In recognizing that the allottee might not be able to farm his allotment in person, with restrictions against alienation, he would not be allowed to do so through a tenant; and, accordingly, it is specially provided that he may carve therefrom a leasehold estate for a year or five years, or, with the approval of the Secretary of the Interior, for a longer term, and as to mineral purposes, for a longer

term, likewise with his approval, and to convey the same to such tenant or lessee."

In *Moore v. Sawyer,* referring to the foregoing case, Campbell, J., said:

"This is the construction given this act by the Supreme Court of this state, as recently decided in the case of *Eldred v. Okmulgee Loan & Trust Co.,* 22 Okla. 742, 98 Pac. 929, and is, I think, in accord with the history and spirit of all congressional legislation looking to the allotment of these lands in severalty and the dissolution of these tribal governments."

But counsel for plaintiff in error in effect say that section 17 should be construed so as to include only the allotment of Creek citizens other than homestead. We do not think so, and have been unable to find any warrant or authority for such conclusion. The first paragraph of section 16 provides that the lands allotted to citizens shall not be incumbered, taken, or sold to secure or satisfy any debt or obligation, nor be alienated by the allottee or his heirs before the expiration of five years from the date of the approval of the supplemental agreement, except with the approval of the Secretary of the Interior. The second paragraph, pertaining to the homestead, provides that it shall be and remain nontaxable, inalienable, and free from any incumbrance whatever for twenty-one years from the date of the deed therefor. It is therefore apparent that both paragraphs contain a provision against alienation; the one dealing with the allotment other than homestead, using the words "nor be alienated"; that dealing with the homestead, "be and remain inalienable." Other limitations are involved in said section, but are not considered, being unnecessary to a decision of the question at issue. The same reasoning that would forbid the leasing of the homestead, as provided by section 17, would prohibit the making of a lease of the surplus allotment until after five years from the making of the treaty, except with the approval of the Secretary of the Interior. This would destroy the efficacy of and render nugatory that part of section 17, authorizing the making of grazing leases for not to exceed one year and agricultural leases for not to exceed five years, except with the approval of the Secretary of the Interior, as provided

in section 16, and which is clearly not contemplated by the provisions of section 17, save in the case of a mineral lease, or where the grazing or agricultural lease is for a term longer than therein named.

Pursuing the reasoning further: If section 16 is to be given the construction contended for, then when, if at all, and under what circumstances, could a lease be made on the homestead? Confining ourselves to section 16. alone, the homestead cannot be alienated for twenty-one years from the date of the deed therefor, except as provided in the following paragraph, which is inapplicable to this case. In *De Graffenreid v. Iowa Land & Trust Co.*, 20 Okla. 687, 95 Pac. 624, this court, in an exhaustive opinion by Turner, J., in discussing the provisions of sections 6, 7, and 28 of the act of March 1, 1901, said that the use of the words "the land," referred to in section 7, and "the lands," referred to in section 28, mean one and the same thing, both referring to the entire allotment, and not alone to the homestead allotment. Section 7, as interpolated and construed by the court in the foregoing case, is as follows:

"Sec. 7. Land allotted to a citizen thereunder (which included that of Castella Brown) shall not in any manner whatsoever or at any time, be incumbered, taken, or sold to secure or satisfy any debt or obligation contracted or incurred prior to the date of the deed of the allottee therefor, and such lands shall not be alienable by the allottee or his heirs at any time before the. expiration of five years from the ratification of this agreement, except with the approval of the Secretary of the Interior, * * * (Limitation.) Each citizen shall select from his allotment forty acres of land as a homestead, which shall be nontaxable and inalienable and free from any incumbrance whatever for twenty-one years (another), for which he shall have a separate deed, conditioned as above; provided * * * the homestead of each citizen shall remain, after the death of the allottee, for the use and support of children born to him after the ratification of this agreement, but if he have no such issue (Castella Brown had none) then he may dispose of his homestead by will (she made none) free from limitation herein (the last above) imposed, and if this be not done (no will made) the land (What land? The homestead? No, or it would have said so. What lands are we talking about? Lands allotted to citizens thereunder—the whole

allotment.) shall descend to his heirs according to the laws of descent and distribution of the Creek Nation, free from such limitation."

The first paragraph of the foregoing section, which is very similar in its provisions necessary to a consideration of the instant case to section 16 of the supplemental treaty, has received additional judicial, as well as departmental, construction in *Sanders v. Sanders et al.,* 28 Okla. 59, 117 Pac. 338, and *Barnes v. Stonebraker,* 28 Okla. 75, 113 Pac. 903, in which it was held that the homestead was included, as well as the other lands. The land in controversy in the latter case was oil land, and while the plaintiff, Stonebraker, had an agricultural lease for five years of the entire allotment, his rights under such lease were not urged or determined, but, instead, the case was rested upon the attempts to pass title absolute by deeds to Stebbens and Ault, with *mesne* conveyance to Stonebraker.

It is a cardinal principle of statutory construction that in arriving at the intent of the lawmaking body, in enacting a statute, not only must the whole statute and every part of it be considered, but, where there are several statutes *in pari materia,* they are all to be referred to and to be taken together and one part construed with another in the construction of any other material provision. *De Graffenreid v. Iowa Land & Trust Co.,* 20 Okla. 687, 95 Pac. 624. That the entire act is to be examined with a view of arriving at the true intention of each part and that effect is to be given, if possible, to the whole instrument and to every section or clause. Courts should give a construction that will render every word operative, rather than one that makes some words idle and nugatory. *Trapp, Auditor, v. Wells Fargo Express Co.,* 22 Okla. 377, 97 Pac. 1003; *Bohart et al. v. Anderson,* 24 Okla. 82, 103 Pac. 742. Following this canon of construction, section 17 would be rendered largely nugatory, as it would prohibit the making of leases of one-fourth of the allotted lands in the Creek Nation for any term until after the expiration of twenty-one years, without the approval of the Secretary of the Interior, and would further prohibit the making of either grazing or agricultural leases on lands other than the homestead

until after five years from the date of the approval of the supplemental agreement, except with the like approval of the Secretary of the Interior. We cannot adopt such a construction. In case of doubt or uncertainty, acts *in pari materia,* passed either before or after, and whether repealed or still in force, may be referred to in order to discern the intent of Congress in the use of particular terms or in the enactment of particular provisions; and, within the reason of the same rule, contemporaneous legislation, not expressly *in pari materia,* may be referred to for the same purpose. *Cope v. Cope,* 137 U. S. 682, 11 Sup. Ct. 222, 34 L. Ed. 832; *Tiger v. Western Investment Co.,* 221 U. S. 286, 31 Sup. Ct. 578, 55 L. Ed. 738; *Prather v. Jeffersonville M. & I. Co.,* 52 Ind. 32; *Taylor v. Board of Commissioners,* 67 Ind. 383; *Douglass v. Howland,* 24 Wend. (N. Y.) 45. And where a statute is of doubtful or uncertain meaning, a recurrence to the circumstances under which it was passed may be had with a view to ascertain the probable intention of the lawmaking body, in enacting it, and to that end the legislative history of the statute may be inquired into. *Wood, etc., Co. v. Caldwell,* 54 Ind. 270, 23 Am. Rep. 641; *Stout v. County of Grant,* 107 Ind. 343, 8 N. E. 222; *People ex rel. Wood v. Lacombe,* 99 N. Y. 43, 1 N. E. 599.

Thus authorized, we have examined sections 19 and 20 of the Act of April 26, 1906, c. 1876, 34 Stat. 144, 145, making provisions for the leasing of the homestead of full-blood Indians, but only in case of the inability of the owner, on account of infirmity or age, to work or farm the homestead. This we think in a measure reflects the intention of Congress, as expressed in its former dealings with the Creeks, in both the Acts of March 1, 1901, and that of June 30, 1902, and is a legislative recognition of the previous right of allottees, including full-blood Indians, to lease the homestead, but which attached an additional limitation to future leasing of the allotted lands of full-blood Indians, without changing the rights and authority of other allottees in the same regard. Section 5 of the Act of May 27, 1908, c. 199, 35 Stat. 313, while not in force at the time of the execution of the lease in question, provides that leases of restricted land made in violation of law, either before or after the approval of the act, should be

absolutely void. The converse of this provision would mean that a valid lease on restricted land should not thereby be affected. In *Commonwealth v. Kimball,* 24 Pick. (Mass.) 370, it was said by Shaw, C. J.:

"That where a proper construction would lead to an absurd consequence, it will be presumed that some exception or qualification was intended by the Legislature to avoid such conclusion."

This rule of construction was approvingly quoted by the Court of Appeals of New York in *People ex rel. Wood v. Lacombe, supra;* the court there observing:

"That where it is apparent that a strict construction of a statute would defeat the main purpose and object, not only of the statute, but of other legislative enactments which relate to the same subject and which had been enacted in pursuance of and according to a general purpose of accomplishing a particular result, such interpretation should not be upheld, as it would be absurd to say that the lawmakers designed to secure a result that would be antagonistic to their plain and clear intention."

*Town of Grove v. Haskell* (not yet officially reported), 116 Pac. 805; *Eldred v. Okmulgee Loan & Trust Co.,* 22 Okla. 742, 98 Pac. 929.

We cannot believe that Congress intended section 16 to have the effect contended for by plaintiff in error. While a large proportion of the Creek citizens and freedmen were engaged in grazing and farming and many of them lived upon or removed to their allotments when selected, at the same time, this rule was far from general. Many allottees lived in the town and were engaged in business avocations and professions, making a residence on their allotments incompatible with the carrying on of their business; others were unable financially or from age, infirmity, or other reasons to reside upon and occupy their allotments and to farm or graze them. This condition was known to Congress, and to the Commissioners to the Five Civilized Tribes, representing the federal government in bringing about the various treaties and acts of Congress. The development of the lands, both prior and subsequent to the various acts and treaties, to a very large extent had been done by noncitizens of the Creek Nation, under leases with citizens and freedmen, and it was not the purpose

or intention to *prohibit,* but instead to *restrict,* the making of agricultural and grazing leases, and to thus encourage the development of the country, and at the same time to yield a return to the allottee. Such has been the manifest purpose of the federal government in bringing about a change in both the land tenures and forms of government among the members of the Five Civilized Tribes.

A fair construction of section 16 and 17 of the supplemental agreement, in so far as the same is necessary to a determination of the question here presented, is that the homestead should be and remain untaxable, inalienable, and free from any incumbrance whatever for twenty-one years from the date of the deed therefor, provided that the same might be leased, as authorized in section 17. Such a construction gives force and effect to both sections of the treaty. This construction is warranted by the further fact that section 17 contains the only provision for leasing or renting allotted lands, and was intended as a limitation upon the previously expressed prohibitions against alienation.

We conclude that the lease given by Ben Sharper to James Wright, on June 22, 1908, upon the performance of its conditions, was valid, and that the judgment of the trial court should in all things be affirmed.

By the Court: It is so ordered.

All the Justices concur.