RATHBUN *v.* STATE OF MICHIGAN.

1. TAXATION—HOMESTEAD ENTRY—SALES—CONSTRUCTION OF STATUTES.

Use in general property tax law of words "purchased" and "lands sold" with reference to disposition of lands, deeded by auditor general to State because taxes were unpaid, for homestead entry makes it unnecessary to search elsewhere for legislative intent in construing whether or not transactions involved would be sales, especially when a different construction would nullify objectives of subsequent statute passed to effectuate great public interests in mineral, coal, oil and gas deposits (1 Comp. Laws 1915, § 4130; Act No. 280, § 8, Pub. Acts 1909; Act No. 262, § 12, Pub. Acts 1917).

2. STATUTES—CONSTRUCTION—OTHER STATUTES RELATING TO SAME SUBJECT.

Statutes will be construed if possible so that other statutes relating to the same subject may be given effect.

3. SAME—STRICT CONSTRUCTION.

Strict construction of a statute should not be followed where such construction would defeat the main purpose of other statutes relating to the same subject.

4. TAXATION—HOMESTEAD ENTRY—SALES.

The transfer of land to a homesteader, pursuant to the general property tax law, is a sale of such land by the State (Act No. 206, Pub. Acts 1893, as amended).

5. MINES AND MINERALS—CONVEYANCES—RESERVATIONS IN DEEDS.

Title to minerals in place may be severed from that to the remainder of the land by proper conveyances, such as by reservation in the deed.

6. REAL PROPERTY—SEVERANCE OF TITLE TO SURFACE AND MINERAL RIGHTS.

Upon severance of the title of minerals from that of the remainder of the land, each estate may be a freehold of an estate in fee simple.

7. PUBLIC LANDS—DEEDS—RESERVATIONS—MINES AND MINERALS.

The State, having title to land of the public domain in fee, may deed surface fee, reserving to itself coal, oil, gas and minerals beneath.

8. TAXATION—HOMESTEAD ENTRY—TITLE CONVEYED.

The term "absolute," as used in general property tax law, in reference to "absolute title * * * in fee" conveyed to a homesteader, refers to the nature of the title and not to the nature of the property included under such title (1 Comp. Laws 1915, § 4130).

9. REAL PROPERTY—TENANT IN FEE SIMPLE.

A tenant in fee simple is he that has lands to hold to him and his heirs forever; generally, absolutely, and simply, without mentioning what heirs.

10. SAME—FEE SIMPLE ESTATE.

The term "fee simple" is not generally used to distinguish between legal and equitable estates, but is used to denote the quantity or duration of estates, whether the enjoyment is limited

or unlimited in point of continuance or duration; an estate in fee simple being the greatest estate and most extensive interest which a person can possess in landed property, being an absolute estate in perpetuity.

11. TAXATION—HOMESTEAD ENTRY—FEE TITLE CONVEYED—MINERAL RIGHTS.

The provision of the general property tax law that the State convey to a homesteader an absolute title in fee does not require that the State convey to him an absolute title in fee to the mineral rights as well as to the surface rights of the land and where the State has the power to sever the absolute fee in the surface rights from the absolute fee in the mineral rights, a deed to a homesteader reserving the mineral, coal, gas and oil rights to the State conveyed only the surface rights (1 Comp. Laws 1915, § 4130; Act No. 280, § 8, Pub. Acts 1909; Act No. 262, § 12, Pub. Acts 1917).

12. SAME—DELINQUENCY OF FIVE YEARS—FEE TITLE IN STATE.

Under the general property tax law, title to land sold for taxes delinquent for five or more years and purchased for the State by the auditor general, not redeemed within the period allowed by law and deeded by the auditor general to the State in fee, became absolute (1 Comp. Laws 1915, § 4126).

13. PUBLIC LANDS—SALES—HOMESTEAD ENTRY—RESERVATION OF MINERAL, COAL, OIL AND GAS RIGHTS.

The provisions of the public domain act, as amended, apply to all lands to which the State has absolute title whether or not such lands are reserved from homestead entry and upon sale of such lands the statute requires reservation to State ownership of mineral, coal, oil and gas rights, hence the only title which the State may convey to a homesteader under the statute is subject to such a reservation (1 Comp. Laws 1915, § 4130; Act No. 280, § 8, Pub. Acts 1909; Act No. 262, § 12, Pub. Acts 1917).

14. SAME—PUBLIC DOMAIN—STATUTES.

Term "public domain," as used in statutes, means lands owned by the State (Act No. 280, Pub. Acts 1909).

15. STATUTES—TITLE OF AN ACT.

The title of an act need not serve as an index but is sufficient if it fairly expresses the subject of the legislation and conveys comprehension of its germane provisions.

16. PUBLIC LANDS—STATUTES.

Provisions of statute prescribing public domain commission's powers and duties with reference to acquisition and disposition of land owned by the State in fee *held*, pertinent to purpose of act as recited in title that it was to create the public domain commission and prescribe its powers and duties (Act No. 280, Pub. Acts 1909, as amended).

17. STATUTES—AMENDMENT—CONSTITUTIONAL LAW—REPUBLICATION.

Constitutional requirement that "no law shall be revised, altered or amended by reference to its title only; but the act revised and the section or sections of the act altered or amended shall be re-enacted and published at length" is directed towards elimination of confusion arising from amendatory acts which merely inserted certain words or substituted one phrase for another in an act or section which was only referred to and not republished and is inapplicable to statutes complete in themselves (Const. 1908, art. 5, § 21).

18. SAME—IN PARI MATERIA.

Statutes *in pari materia* are those which relate to the same person or thing, or to the same class of persons or things, or which have a common purpose; and although an act may incidentally refer to the same subject as another act, it is not *in pari materia* if its scope and aim are distinct and unconnected.

19. SAME—CONSTRUCTION—OTHER STATUTES.

In the construction of a particular statute or in the interpretation of its provisions, all statutes relating to the same subject or having the same general purpose should be read in connection with it, as together constituting one law although enacted at different times and containing no reference to one another, to the end that it may be determined how the legislative policy with reference to the subject-matter has been changed or modified from time to time.

20. SAME—CONSTRUCTION—IN PARI MATERIA.

Statutes *in pari materia*, although in apparent conflict, should, so far as reasonably possible, be construed in harmony with each other, so as to give force and effect to each, as it will not be presumed that the legislature, in the enactment of a subsequent statute, intended to repeal an earlier one, unless it has done so in express terms; nor will it be presumed that the legislature intended to leave on the statute books two contradictory enactments.

21. SAME—REPEALS BY IMPLICATION.

Repeals of statutes by implication are not favored.

22. SAME—CONSTRUCTION—REASONABLE FIELD OF OPERATION.

It is the duty of courts to construe seemingly contradictory enactments without destroying their evident intent and meaning and preserving the force of both if such can be done by any fair, strict or liberal construction, as to find for the two provisions a reasonable field of operation.

23. SAME—CONSTRUCTION OF LATER STATUTE ON SAME SUBJECT.

A subsequent statute embracing only part of a subject covered comprehensively by a prior law should be construed together with it unless a different legislative intent appears, the later being an exception or qualification of the prior only so far as they are repugnant.

24. SAME—OBJECT OF RULE IN PARI MATERIA.

The object of the rule *in pari materia* is to carry into effect the purpose of the legislature as found in harmonious statutes on a subject.

25. PUBLIC LANDS—STATUTES IN PARI MATERIA—DISPOSITION OF PUBLIC DOMAIN—RESERVATION OF MINERAL, COAL, OIL AND GAS RIGHTS.

General property tax law relative to assessment, levy, collection and enforcement of property taxes, foreclosure of tax liens and for acquisition by the State of absolute title to lands for delinquent taxes and for the sale of such property *held*, not amended or repealed by, but *in pari materia* with, subsequently enacted public domain statute relative to disposition of public domain and requiring that deeds from State reserve to it all mineral, coal, oil and gas rights (1 Comp. Laws 1915, § 4130; Act No. 280, Pub. Acts 1909, as amended).

26. SAME—SALES—RESERVATIONS TO STATE—CONSTITUTIONAL LAW—STATUTES.

Public domain act providing for reservation of oil, gas, coal and mineral rights in all lands owned by the State infringes upon no other statute, hence contravenes no provision of Constitution relative to re-enactment of altered or amended statute or sections thereof (Const. 1908, art. 5, § 21; Act No. 280, Pub. Acts 1909, as amended).

27. EQUITY—PLEADING—SUFFICIENCY—DISMISSAL.

Whenever any pleading in equity is deemed insufficient in substance, a motion to dismiss, or for judgment on the pleading may be made (Court Rule No. 17, § 7 [1933]).

28. PUBLIC LANDS—RESERVATIONS IN DEEDS TO LANDS RESERVED FOR HOMESTEAD ENTRY.

Bill by grantee of purchaser of lands, reserved for homestead entry to which the State had acquired absolute title upon sale for delinquent taxes and had reserved mineral, coal, oil and gas rights upon sale to plaintiff's grantor, to nullify such reservation *held*, insufficient in substance and properly dismissed on motion as a matter of law (1 Comp. Laws 1915, § 4130; Act No. 280, Pub. Acts 1909, as amended).

29. PLEADING—MOTIONS TO DISMISS—DISPUTED QUESTIONS OF FACT —AFFIRMATIVE DEFENSES—SURPLUSAGE.

If, in motions to dismiss, there may have been included disputed questions of fact and affirmative defenses, they are to be considered as surplusage and unnecessary for consideration in dismissing the bill.

30. SAME—MOTION TO DISMISS—ANSWER.

A motion to dismiss is proper prior to filing of answer.

31. COSTS—PUBLIC QUESTION.

No costs are allowed in case involving construction of general property tax law, public domain act and validity of reservations of mineral, coal, oil and gas rights and deed of land, acquired by State for delinquent taxes, to homesteader (1 Comp. Laws 1915, § 4130; Act No. 280, § 8, Pub. Acts 1909; Act No. 262, § 12, Pub. Acts 1917).

Appeal from Gladwin; Reid (Neil E.), J., presiding. Submitted March 28, 1938. (Docket No. 146, Calendar No. 40,043.) Decided June 6, 1938.

Bill by Lena L. Rathbun against State of Michigan, P. J. Hoffmaster, Director of Conservation, and others to declare null and void certain oil leases, for an injunction and other relief. Separate motions to dismiss by defendants State of Michigan, Naph-Sol Refining Company and others. Motion by plain-

tiff to dismiss the motions to dismiss made by certain defendants. On hearing of motions, bill dismissed. Plaintiff appeals. Affirmed.

*Yeo & Bilitzke,* for plaintiff.

*Raymond W. Starr,* Attorney General, and *Edmund E. Shepherd,* Assistant Attorney General, for defendants State of Michigan, Hoffmaster, Director of Conservation, and Osgood, Secretary of Department of Conservation.

*A. W. Penny,* for defendants Naph-Sol Refining Company, Rex Oil & Gas Company, and H. M. McClure.

*Floyd A. Calvert* and *Lowell Jones,* for defendant Pure Oil Company.

*Clark, Klein, Brucker & Waples* (*Robert C. Winter,* of counsel), for defendant J. V. Wicklund Development Company.

McALLISTER, J. On September 24, 1921, J. F. Rathbun made application to the department of conservation for a homestead certificate for 80 acres of land in Buckeye township, Gladwin county. These lands had, on February 17, 1921, been deeded by the auditor general to the State of Michigan because of delinquent taxes, under Act No. 206, § 127, Pub. Acts 1893 (1 Comp. Laws 1915, § 4126). In his application Rathbun recited that he would accept the certificate and deed with reservation of mineral, oil and gas to the State of Michigan. On October 25, 1921, the department of conservation issued to the said Rathbun a tax homestead certificate reserving to the State all mineral, coal, oil and gas rights. On January 31, 1922, Rathbun filed with the department an

affidavit entitled "Proof of settlement," to the effect that he was an actual resident upon and in possession and occupancy of the land described in the certificate. Having lived on said land for a period of five years as required by law relating to title by homestead, Rathbun, on December 1, 1926, filed with the department his "oath of homestead" together with supporting affidavits, and on January 4, 1927, "a homestead tax deed" was executed by the department of conservation to J. F. Rathbun in which the mineral, coal, oil and gas rights previously referred to in the application and certificate were reserved to the State. This deed was recorded November 10, 1927, in the office of the register of deeds of Gladwin. county.

On October 17, 1929, Rathbun executed an oil and gas lease to the Pure Oil Company which was discharged December 31, 1931, and the discharge was recorded January 8, 1932. On March 3, 1934, Rathbun executed another such lease to one G. M. Smith which was recorded June 8, 1936.

On February 6, 1936, the department of conservation executed an oil and gas lease to J. V. Wicklund which was recorded January 5, 1937, and which in turn was assigned to J. V. Wicklund Development Company. Other assignments were made to various parties named in this case. These assignees developed the property and at the present time have eight producing wells situated on the land in question.

On December 30, 1936, J. F. Rathbun executed and delivered a warranty deed with no reservations of any kind to Lena L. Rathbun, plaintiff herein, which deed was recorded March 9, 1937.

On September 28, 1937, Lena L. Rathbun filed a bill in equity praying for a temporary injunction

restraining the assignees of the oil lease executed by the State from further drilling operations and from extracting, removing or storing gas, oil and minerals produced from plaintiff's property. Plaintiff further asked the court to decree that the oil and gas lease executed by the department of conservation be null and void; that the reservations made in the deed from the department to J. F. Rathbun be decreed to be of no force and effect; that defendants account to plaintiff for all gas, oil and minerals theretofore obtained or removed from the property; that the State refund to plaintiff any sums received by virtue of its oil lease on account of oil, gas and minerals extracted from the property; and for a permanent injunction restraining defendants from going upon or removing any minerals, coal, oil and gas from plaintiff's land.

Defendants moved to dismiss the bill of complaint, and plaintiff thereafter moved to dismiss defendants' motions to dismiss the bill. On the hearing of the motions, the circuit court denied plaintiff's motion to dismiss the defendants' motions to dismiss the bill of complaint and granted defendants' motions; and accordingly entered an order dismissing the bill of complaint, from which plaintiff appeals.

The bill of complaint alleges that J. F. Rathbun received his deed as a homesteader from the State without reservations as to oil, coal, gas and mineral rights. It is claimed that section 131 * (Act No. 206, Pub. Acts 1893), as amended by the act of 1915 (Act No. 208), and in force at the time J. F. Rathbun made his application for homestead certificate on September 24, 1921, provided for the conveyance by the State of an absolute title in fee to the homesteader, and that the fee was to the entire interest owned by

* 1 Comp. Laws 1915, § 4130.—REPORTER.

the State in the lands in question without any severance of the mineral rights; that the statute as it then existed did not permit a reservation of oil and gas rights to the State.

Plaintiff further claims that the homesteader, J. F. Rathbun, having complied with all the requirements of the State respecting the homesteading of the 80 acres in question, and the State having determined his compliance in the manner provided by law, and he, having paid the statutory fee of 10 cents an acre on account thereof, and having received conveyance from the State, became and was entitled, by reason of the provisions of Act No. 206, Pub. Acts 1893, as amended, to an absolute deed from the State in fee simple, and that plaintiff, his daughter-in-law, the grantee of his interest in the lands in question, is similarly entitled now to be treated and considered as though she were the grantee from the State of the absolute ownership of all of the title of the State in the lands, including both surface and mineral rights.

Plaintiff further claims that it was fraudulent and illegal on the part of the State officials to require of J. F. Rathbun, in order to obtain the homestead certificate, that he subscribe to an application containing the reservation in question; that it was fraudulent and illegal to issue to J. F. Rathbun the homesteader's certificate containing such recital and that it was fraudulent and illegal for such officials representing the State to issue to J. F. Rathbun the deed containing such reservations to the State.

Defendants contend that Act No. 206, § 131, Pub. Acts 1893, as amended, in effect, provided that the purchaser should acquire, and the State should protect the purchaser in the ownership in fee of what was granted by the State to the grantee or purchaser; that an absolute fee can be conveyed at the

same time reserving mineral rights; that under Act No. 280, § 8, Pub. Acts 1909, as amended, the State through its duly constituted agency was required to reserve oil, coal, gas and mineral rights to the State on sales of public-owned land. It is further claimed by defendants that the application for homestead certificate by J. F. Rathbun, his payment of money to the State, and the deed from the State to said Rathbun, constituted the only contract which the State made; that Rathbun never applied to the State for anything except the surface rights of the land, that these were what he accepted; that so far as the State is concerned, this was everything that the State ever intended he should receive and that, accordingly, the State has completely discharged its obligation and fulfilled its contract. It is also urged that the deed from the State to Rathbun was either entirely good or entirely void, and that the grantee therein cannot accept benefits under a part of the deed, and, in part, reject it. There are other defenses, including laches, estoppel, and that plaintiff has no claim for fraud as such claim was personal to her grantor and does not pass to the grantee by an assignment of the lands.

Section 8 of Act No. 280, Pub. Acts 1909, was made a part of the contract. This section became, successively, Act No. 294, § 12, Pub. Acts 1911; then Act No. 333, § 12, Pub. Acts 1913; then Act No. 262, § 12, Pub. Acts 1917. However, the provisions relative to this case remained the same.

Plaintiff, in effect, admits that Act No. 280, Pub. Acts 1909, as amended, directs the State to reserve the rights in question on sales of State-owned land, but contends that Rathbun did not receive the land by sale but by virtue of homestead entry; that such rights of homestead are governed by the general tax laws of the State, included in Act No. 206, Pub. Acts

1893, as amended, and that if Act No. 280, Pub. Acts 1909, as amended, be construed as amendatory to the general tax laws without special recital setting forth that the said tax laws are so amended, such act is unconstitutional and void.

Section 131 of Act No. 206, Pub. Acts 1893, as amended (1 Comp. Laws 1915, § 4130), and in effect at the time of the transaction in this case, provided:

"Such deed shall convey an absolute title to the lands *sold*."

It is further provided "that any person who has *purchased* and entered into possession of any lands as a homestead" shall receive a deed under certain conditions.

The legislature having chosen to use the words, "purchased" and "lands sold," with reference to homestead lands, it is unnecessary to search for the legislative intent outside the provisions of the statute for assistance in construing the act as to whether such transactions are sales. Such a literal construction is especially to be followed when otherwise the effect would be to nullify the objectives of a subsequent statute passed to effectuate great public interests; for statutes will be construed if possible so that other statutes with relation to the same subject may be given effect. Where a strict construction of a particular statute would defeat the main purpose of other statutes relating to the same subject, such construction should not be followed. *Groom* v. *Wright,* 30 Okla. 652 (121 Pac. 215). Consonant with the language used by the legislature and in compliance with the accepted rules of statutory construction, it must be held that under Act No. 206, Pub. Acts 1893, as amended, the transfer of land to a homesteader is a sale of such land by the State.

Section 131 of Act No. 206, Pub. Acts 1893, as amended by Act No. 208, Pub. Acts 1915 (1 Comp. Laws 1915, § 4130), designated as section 131 of the "general property tax law," in force at the time the lands in question were deeded to the State, and as it stood September 24, 1921, when Rathbun applied for homestead certificate, provided:

"Such person (the homesteader) shall be entitled to a deed of such land from the State, executed by the commissioner of the State land office on behalf of the State, which deed shall be in such form as the commissioner of the State land office shall determine; the said deed shall be witnessed and acknowledged and shall be entitled to record in the office of the register of deeds in the proper county, in the same manner and with like effect as other deeds are duly witnessed, acknowledged and certified. Such deed shall convey an absolute title to the lands sold, and shall be conclusive evidence of title in fee in the grantee, and it shall be the duty of the State of Michigan to defend and prosecute all suits brought to protect such title, and the State shall pay all costs adjudged against the homesteader."

It is argued by plaintiff that the above section of the statute prescribed the conditions upon the performance of which the homesteader acquired an indefeasible right to a deed conveying an absolute title in fee simple to all the property transferred, including oil, gas, coal and other minerals; that because such a homestead entry contract reserving mineral rights to the State is not provided for by said statute, the State is not authorized to grant a lesser estate to a homesteader than such a fee simple with all mineral, coal, oil and gas rights; that the director of conservation was without authority to insert reservations in the deed; and that the subject

of homestead entry contracts was restricted by the general tax laws which can only be changed by expressly recited amendments to that statute.

In this contention, plaintiff assumes that "an absolute title * * * in fee," which is the language used in the statute, means a title in fee to the surface rights as well as to all other rights, including minerals, beneath the surface of the land. In *Walters* v. *Sheffield,* 75 Fla. 505, 511 (78 South. 539), it is said:

"By the common law also several sorts of estates or interests, joint or several, may exist in the same fee; as that one person may own ground or soil, another the structures thereon, another the minerals beneath the surface, and still another the trees and wood growing thereon."

Minerals in place may be severed from the remainder of the land by proper conveyances. Severance of all the minerals from the remainder of the lands may be effected by a reservation in the deed. Upon severance of the title of minerals from that of the remainder of the land, each estate may be a freehold of an estate in fee simple. *Humphreys-Mexia Co.* v. *Gammon,* 113 Tex. 247 (254 S. W. 296, 29 A. L. R. 607).

"The State, having title in fee, could, like any other owner in fee, deed with reservation of the oil, coal, gas and minerals. * * *

"The State as owner of the land, could sever the estate in fee to the surface from that of fee in the oil and gas underlying the surface." *Krench* v. *State of Michigan,* 277 Mich. 168, 179, 180.

The term "absolute" as used in the statutory language, "absolute title * * * in fee," refers to the nature of the title and not to the nature of the property included under such title.

In 21 C. J. p. 918, it is said:

"A tenant in fee simple is he that hath lands, tenements, hereditaments, to hold to him and his heirs forever; generally, absolutely, and simply, without mentioning what heirs, but referring that to his own pleasure, or to the disposition of the law. 'Fee simple' and 'fee' are generally used as convertible terms, and it has been held that the several terms 'fee,' 'fee simple,' and 'fee simple absolute' are substantially synonymous, and that an absolute estate is a fee simple. But 'fee simple' does not necessarily mean a 'fee simple absolute' as the former term may be applied to a base or determinable fee or to a fee conditional, while the latter can be applied only to an estate which is limited absolutely to a man and his heirs and assigns forever without limitation or condition. The material difference between a fee simple and other fees is that the former estate will, the latter may, continue forever. The term 'fee simple' is not generally used to distinguish between legal and equitable estates, but is used to denote the quantity or duration of estates, whether the enjoyment is limited or unlimited in point of continuance or duration."

"An estate in fee simple is the greatest estate and most extensive interest which a person can possess in landed property, being an absolute estate in perpetuity." 21 C. J. p. 919.

"A fee therefore, in general, signifies an estate of inheritance; being the highest and most extensive interest that a man can have in a feud; and, when the term is used simply, without any other adjunct, or has the adjunct of *simple* annexed to it (as a fee, or a fee-simple) it is used in contradistinction to a fee conditional at the common law, or a fee-tail by the statute; importing an absolute inheritance, clear of any condition, limitation, or restrictions to particular heirs, but descendible to the heirs general,

whether male or female, lineal or collateral.'' 2
Blackstone Commentaries (8th Ed.), p. 106.

''Of fee simple, it is commonly holden that there
be three kinds, *viz.* fee simple absolute, fee simple
conditional, and fee simple qualified, or a base fee.
But the more genuine and apt division were to divide
fee, that is, inheritance, into three parts, *viz.* simple
or absolute, conditional, and qualified or base. For
this word (simple) properly excludeth both condi-
tions and limitations, that defeat or abridge the
fee.'' 1 Coke upon Littleton, bk. 1, chap. 1, § 1,
p. 1b.

The statutory provision that the State convey to a
homesteader an absolute title in fee did not require
that the State convey to Rathbun an absolute title
in fee to the mineral rights, as well as to the surface
rights of the lands in question. If the State was
empowered to sever the absolute fee in the surface
rights from the absolute fee in the mineral rights,
Rathbun in this case received everything to which
he was entitled when he received the absolute title
in fee to such surface rights of the land.

The protection and conservation of natural re-
sources of the State particularly engaged the atten-
tion of the government in 1907, when by Act No. 188,
of the Public Acts of that year the legislature
authorized the appointment by the governor of a
commission of inquiry with the object, expressed in
the title of the act, of making ''the necessary pre-
liminary investigations and to prepare and submit
a report to the next legislature setting forth a com-
prehensive plan for the protection, improvement,
utilization, and settlement of, and for the better and
more economical administration of the affairs and
business of the State connected with the delinquent
State tax lands, now owned or hereafter acquired
* * * to the end that the State may hereafter pursue

a consistent and complete policy in reference thereto.'' The commission appointed by the governor filed a report in 1908, and in 1909 by Act No. 280 of that year,* pursuant to the recommendations contained in the report, there was created a ''public domain commission.'' This act was designed to correct existing evils, to remedy a deplorable situation which had grown out of private exploitation of the natural resources of the State. In the report of the commission of inquiry authorized by Act No. 188, Pub. Acts 1907, it was observed: †

''The primary subject for our consideration is the State land which the act refers to as 'delinquent State tax land.' The act itself makes it entirely clear that the land in question is that which has been, or shall hereafter be, owned by the State by reason of forfeiture of the title for nonpayment of taxes by the former owner.'' (p. 5 of report.)

''*Exploitation for profit to speculators at the State's expense, is the net result of the present land system and methods.*'' (p. 11 of report.)

''Most of the land examined was not sold to actual settlers, but to people who are either in the timber business or to persons regularly engaged in land traffic and who evidently purchased them for speculative purposes.'' (p. 12 of report.)

''*The laws allowing sales of tax homestead land have not contributed materially to bring in actual settlers.*'' (p. 16 of report.)

''We believe, therefore, that the interests of the State affecting the public domain and natural resources should be brought under one department, to be administered by a commission having general charge, and sub-departmental heads having charge of the routine of administration.'' (p. 37 of report.)

---

* As amended, see 1 Comp. Laws 1915, § 445 *et seq.*—REPORTER.

† Report of Commission of Inquiry, Tax Lands and Forestry to the Governor and Legislature of the State.

Attached to the report is a proposed bill, section 1 of which provides for the creation of a public domain commission; section 2, that:

"Said commission shall have power and jurisdiction over, and have the management, control and disposition according to law of, the public lands; of forest reserves and forest interests." (p. 145 of report.)

Section 5 provides:

"The duties of the commissioner of the State land office shall be as under the laws now or hereafter in force, but subject to the supervision, control and direction of the said commission, and such other duties as said commission shall from time to time require." (p. 146 of report.)

Among the provisions of the public domain act, as amended, and in effect when Rathbun received his homestead certificate were the following:

"SEC. 3. The words 'public domain' shall include all lands now owned by the State subject to entry and all lands that shall hereafter be deeded to the State by the auditor general under the provisions of existing law." (1 Comp. Laws 1915, § 447.)

Act No. 270, Pub. Acts 1913, transferred the powers and duties of the commissioner of the State land office to the public domain commission; Act No. 17, Pub. Acts 1921, transferred the powers and duties of the public domain commission to the conservation department and provided:

"SEC. 3. It is hereby made the duty of the department of conservation to protect and conserve the natural resources of the State of Michigan."

Returning to a discussion of the general property tax law, according to Act No. 206, § 127, Pub. Acts

1893, as amended by Act No. 107, Pub. Acts 1899 (1 Comp. Laws 1915, § 4126), it is provided that where lands have been delinquent in taxes for five years and have been bid off to the State by reason of such delinquent taxes, after the period for redemption of such sale, "the title to the State shall be deemed absolute in and to said lands."

It is further provided that in such cases, the auditor general and the commissioner of the State land office shall determine the value of such lands; whether they are abandoned; and whether suits are pending to set aside taxes or remove cloud upon title occasioned thereby. Within 90 days of such determination the auditor general is obliged to transfer such lands by deed "to the State of Michigan as to an individual," and upon the delivery of such deed the "commissioner shall hold said lands as State lands, subject to the provisions hereinafter contained."

By the foregoing provisions there can be no doubt that after the period for redemption of property bid off to the State for delinquent taxes, the State receives the absolute title to such lands, and in the instant case the State owned the absolute title to the lands in controversy prior to any of the transactions with J. F. Rathbun.

Act No. 280, Pub. Acts 1909, as amended (effective from 1921-1927), provides:

"SEC. 12. When any sales are made by and under the direction of the commission the deeds by which said lands are conveyed shall reserve all mineral, coal, oil and gas rights to the State and said rights shall be owned by the State."

The provisions of the public domain act, as amended, apply to all lands to which the State has absolute title, whether or not such lands are reserved from homestead entry. The provisions of

the statute, therefore, are applicable to the transactions in this case whereby the State transferred a homestead title to J. F. Rathbun reserving the oil and gas rights to the State.

Plaintiff, however, contends that if Act No. 280, Pub. Acts 1909, as amended, is construed as applicable to homestead lands, authorizing a reservation of mineral rights by the State in deeds to homesteaders, such act is unconstitutional. It is argued that such a construction of the statute would be in conflict with the general tax law for the reason that such tax law governs the disposition of homestead lands, and accordingly, Act No. 280, Pub. Acts 1909, would be amendatory to that law without having recited in its title that it was an amendment thereto. Article 5, § 21, Const. 1908 of the State of Michigan provides:

"No law shall embrace more than one object, which shall be expressed in its title. No law shall be revised, altered or amended by reference to its title only; but the act revised and the section or sections of the act altered or amended shall be reenacted and published at length."

Whether the public domain act was required to contain a recital that it amended the general property tax law, or whether in fact such law was amended thereby, depends upon whether the two statutes relate to the same subject matter and are to be construed together *in pari materia*. In *Krench v. State of Michigan, supra,* a purchaser from the State of land reserved from homestead entry claimed that Act No. 280, Pub. Acts 1909, was unconstitutional because it authorized the State to reserve mineral, coal, oil and gas rights in the land deeded to her and that such sales being governed by Act No. 206, Pub. Acts 1893, could not be affected

by Act No. 280, Pub. Acts 1909, for the reason that the title of the latter did not conform to the Constitution in that it did not recite that it was amendatory to the general property tax law. In passing upon such contention, Mr. Justice WIEST, speaking for the court, said:

"The body of the act runs true to the title if its provisions apply to land owned by the State in fee.

"The term 'public domain,' in State legislation, means lands owned by the State. No more comprehensive purpose could possibly be declared than that mentioned in the title. The title need not serve as an index; it is sufficient if it fairly expresses the subject of the legislation and conveys comprehension of its germane provisions. *Westgate* v. *Township of Adrian,* 161 Mich. 333.

"The land in suit was part of the public domain and the act in all of its provisions is pertinent to the powers and duties to be exercised by the public domain commission with reference to acquisition and disposition of land owned by the State in fee."

In the *Krench Case,* the court had before it for consideration the question of whether a sale of lands, reserved from homestead entry properly contained a reservation of oil, gas and mineral rights. The question of the constitutionality of the public domain act as applicable to such land was raised; but the issue was narrowly presented, and the decision of the court was limited to lands reserved from homestead entry. In deciding the case, the court refused to entertain consideration of the proposition that the public domain act was unconstitutional, but held that because the title to such land had become absolute in the State, and a new chain of title had started with the State, it could, as owner of the land, sever the fee of the surface from that of the mineral rights. But an adjudication of the constitutional

question with regard to homestead lands was not sought, and no determination thereupon was made by the court.

In discussing the provisions of the Constitution relating to publication of sections of prior statutes in statutes amendatory thereto, and the construction of such constitutional provisions, Justice COOLEY, speaking for this court, in *People, ex rel. Drake*, v. *Mahaney*, 13 Mich. 481, 496, said:

"If, whenever a new statute is passed, it is necessary that all prior statutes, modified by it by implication should be re-enacted and published at length as modified, then a large portion of the whole code of laws of the State would require to be republished at every session, and parts of it several times over, until, from mere immensity of material, it would be impossible to tell what the law was. If, because an act establishing a police government modifies the powers and duties of sheriffs, constables, water and sewer commissioners, marshals, mayors and justices, and imposes new duties upon the executive and the citizen, it has thereby become necessary to re-enact and republish the various laws relating to them all as now modified, we shall find, before the act is completed, that it not only embraces a large portion of the general laws of the State, but also that it has become obnoxious to the other provisions referred to, because embracing a large number of objects, only one of which can be covered by its title.

"This constitutional provision must receive a reasonable construction, with a view to give it effect. The mischief designed to be remedied was the enactment of amendatory statutes in terms so blind that legislators themselves were sometimes deceived in regard to their effect, and the public, from the difficulty in making the necessary examination and comparison, failed to become apprised of the

changes made in the laws. An amendatory act which purported only to insert certain words, or to substitute one phrase for another in an act or section which was only referred to but not republished, was well calculated to mislead the careless as to its effect, and was, perhaps, sometimes drawn in that form for that express purpose. Endless confusion was thus introduced into the law, and the Constitution wisely prohibited such legislation. But an act complete in itself is not within the mischief designed to be remedied by this provision, and cannot be held to be prohibited by it without violating its plain intent.''

In 59 C. J. p. 1042, it is said:

''Statutes *in pari materia* are those which relate to the same person or thing, or to the same class of persons or things, or which have a common purpose; and although an act may incidentally refer to the same subject as another act, it is not *in pari materia* if its scope and aim are distinct and unconnected. It is a well-established rule that in the construction of a particular statute, or in the interpretation of its provisions, all statutes relating to the same subject, or having the same general purpose, should be read in connection with it, as together constituting one law, although they were enacted at different times, and contain no reference to one another. The endeavor should be made, by tracing the history of legislation on the subject, to ascertain the uniform and consistent purpose of the legislature, or to discover how the policy of the legislature with reference to the subject-matter has been changed or modified from time to time. In other words, in determining the meaning of a particular statute, resort may be had to the established policy of the legislature as disclosed by a general course of legislation. With this purpose in view therefore it is proper to consider, not only acts passed at the same session

of the legislature, but also acts passed at prior and subsequent sessions.''

See, also, *Miles, ex rel. Kamferbeek,* v. *Fortney,* 223 Mich. 552, 558; *Remus* v. *City of Grand Rapids,* 274 Mich. 577, 581.

''Statutes *in pari materia,* although in apparent conflict, should, so far as reasonably possible, be construed in harmony with each other, so as to give force and effect to each, as it will not be presumed that the legislature, in the enactment of a subsequent statute, intended to repeal an earlier one, unless it has done so in express terms; nor will it be presumed that the legislature intended to leave on the statute books two contradictory enactments.''   59 C. J. p. 1051.

''Statutes *in pari materia* are to be construed together, and repeals by implication are not favored. The courts will regard all statutes upon the same general subject-matter as part of one system, and later statutes should be construed as supplementary or complementary to those preceding them.''   *State* v. *Omaha Elevator Co.,* 75 Neb. 637 (106 N. W. 979, 110 N. W. 874).   Quoted with approval in *Wayne County* v. *Auditor General,* 250 Mich. 227, 233.

''The legal presumption is that the legislature did not intend to keep really contradictory enactments in the statute book, or to effect so important a measure as the repeal of a law without expressing an intention to do so.   An interpretation leading to such a result should not be adopted unless it be inevitable.   But the canon of construction in such cases is that if the courts can by any fair, strict or liberal construction find for the two provisions a reasonable field of operation, without destroying their evident intent and meaning, preserving the force of both, and construing them together in harmony with the whole course of legislation upon the

subject it is their duty to do so." *State, ex rel. Ellis,* v. *Givens,* 48 Fla. 165, 174 (37 South. 308).

Where a statute embraces only part of a subject covered comprehensively by a prior law, the two should be construed together unless a different legislative intent appears; the later being an exception or qualification of the prior only so far as they are repugnant. *Stewart* v. *Deland-Lake Special Road and Bridge District in Volusia County,* 71 Fla. 158 (71 South. 42).

"The object of the rule *in pari materia* is to carry into effect the purpose of the legislature as found in harmonious statutes on a subject." *C. N. Ray Corp.* v. *Secretary of State,* 241 Mich. 457.

Section 131 (1 Comp. Laws 1915, § 4130) of the general property tax law, and section 8 (Act No. 280, Pub. Acts 1909) of the public domain act, as amended, both relate to the disposition of State lands. There is nothing inconsistent or contradictory in their various provisions. While the general property tax law makes provision for the assessment, levy, collection and enforcement of property taxes and the foreclosure of tax liens, it also provides for the acquisition by the State of absolute title to lands for delinquent taxes and for the sale of such property, originally through the commissioner of the State land office; then through the public domain commission; and thereafter through the department of conservation. These various statutes —the general tax law, the act for the appointment of a commission of inquiry, the public domain act, and the conservation act—all were concerned with the question of disposition of State lands and the successive legislative enactments indicate a growth of general public policy with regard to such disposi-

tion and conservation of these resources of the State. The various statutes are not contradictory or conflicting in their terms but are consistent and harmonious.

The only ground upon which plaintiff seeks to have the public domain act declared unconstitutional is, not that it is in contradiction to the general property tax law, but only that the title of the act does not purport to amend the tax law as is required of amendatory statutes by the State Constitution.

The public domain act did not amend or repeal the general property tax law. The two statutes relating to the matter of disposition of lands to which the State had absolute title are in harmony, and are to be construed together *in pari materia* with reference to the disposition of the public domain.

The public domain act providing for reservation of oil, gas, coal and mineral rights in all lands owned by the State infringes upon no other statute and contravenes no provision of the Constitution in this regard. It, therefore, follows that the State properly included reservations of the oil and gas rights in the lands which were transferred by homestead deed to J. F. Rathbun.

Plaintiff contends that the trial chancellor was in error in dismissing the bill of complaint on motions before answer; and that the motions to dismiss included disputed questions of fact and matters of affirmative defense, which could not be disposed of in such a proceeding.

Whenever any pleading in equity is deemed insufficient in substance, a motion to dismiss, or for judgment on the pleading may be made. Court Rule No. 17, § 7 (1933). Plaintiff's bill of complaint was insufficient in substance. It did not state a cause of

action, and was properly dismissed on motion as a matter of law.

If, in the motions to dismiss, there may have been included disputed questions of fact and affirmative defenses, they are to be considered as surplusage, unnecessary for consideration in dismissing the bill. A motion to dismiss is proper, prior to filing of answer. *Dunn* v. *Peck,* 255 Mich. 391.

In view of the foregoing, it is unnecessary to consider the matter of laches, estoppel and other questions presented on the appeal.

The order of the circuit court denying plaintiff's motion to dismiss defendants' motions to dismiss the bill of complaint, and granting defendants' motions to dismiss, is affirmed. A public question being involved, no costs are allowed.

BUSHNELL, SHARPE, POTTER, and CHANDLER, JJ., concurred with McALLISTER, J.

WIEST, C. J. I concur in the result. This case is governed by applicable principles stated in *Krench* v. *State of Michigan,* 277 Mich. 168.

The reservations in the deed to J. F. Rathbun were valid and he and all claimants of title under or through him can assert no other right, claim or title.

BUTZEL, CHANDLER, and NORTH, JJ., concurred with WIEST, C. J.