HOUSE SPEAKER v STATE ADMINISTRATIVE BOARD

Docket No. 92072. Argued October 14, 1992 (Calendar No. 8). Decided January 15, 1993.

Speaker of the House of Representatives Lewis N. Dodak, Chairman of the House Appropriations Committee Dominic J. Jacobetti, Senate Minority Leader Arthur Miller, and Vice-Chairman of the Senate Appropriations Committee David S. Holmes, Jr., brought an action as individual members of the Legislature in the Ingham Circuit Court against the State Administrative Board, Governor John M. Engler, and others, challenging the board's authority under § 3 of the State Administrative Board act to transfer appropriated funds from one program to another within a department of state government and sought a permanent injunction prohibiting implementation of the contested transfers and a declaration that the board has no independent authority to make transfers of appropriated funds within any department. The court, Thomas L. Brown, J., granted summary disposition for the defendants, finding that the plaintiffs lacked standing to sue. The Court of Appeals, Hood, P.J., and Sullivan and Reilly, JJ., granted immediate consideration and enjoined the transfers before ruling on the merits of the case. The defendants filed an emergency application seeking leave to appeal in the Supreme Court. In lieu of granting leave, the Supreme Court ordered the Court of Appeals to expedite its consideration of the case. Thereafter, in an opinion per curiam, the Court of Appeals found that the plaintiffs had standing and that the intradepartmental transfer in question was invalid because the statutory authority relied upon by the board had been impliedly repealed by subsequent legislative acts (Docket No. 140914). The defendants appeal.

In an opinion by Justice Griffin, joined by Justices Levin, Brickley, and Riley, the Supreme Court held:

Chairman of the House Appropriations Committee Dominic J. Jacobetti was deprived of a specific statutory right to participate in the legislative process, sufficient to confer

REFERENCES

Am Jur 2d, Public Funds § 5.

See the ALR Index under Public Moneys.

standing. The State Administrative Board's transfer authority was not repealed by implication.

1. Standing requires a demonstration that a plaintiff's substantial interest will be affected detrimentally in a manner different from the citizenry at large. As a member of the House Appropriations Committee, plaintiff Jacobetti has been denied the specific statutory right to participate in the legislative process, sufficient to confer standing. The standing claim of plaintiff Holmes, on the other hand, is deficient because he was not denied an opportunity to vote on the transfer at issue. Thus, he is not suing to maintain the effectiveness of his vote, but to reverse the outcome of a political battle he lost.

2. A repeal of legislation may be inferred where it is clear that a subsequent legislative act conflicts with a prior act or where a subsequent act of the Legislature clearly is intended to occupy the entire field covered by a prior enactment. Neither the legislative history of §§ 3 and 6 of the State Administrative Board act nor the enactment of the Management and Budget Act permit an inference that the general transfer power of § 3 was repealed by implication. Nor do § 3 of the State Administrative Board act and § 393 of the Management and Budget Act conflict. Section 393 grants transfer power to the budget director, while § 3 grants transfer power to the administrative board. The budget director and the board have separate duties; each utilizes different decision-making procedures and operates under different levels of accountability.

3. Nothing in the Management and Budget Act suggests an intent to eliminate the board's power to transfer funds within a department. Clearly, the Legislature did not repeal § 3. In light of the review of the statute, it is doubtful at the least that the failure to repeal the transfer language of § 3 was an accident. To now disregard the unambiguous language of § 3 on the basis that it has been impliedly repealed would be an extraordinary step to be taken only when the legislative intent is clear. In this case, it is not.

Affirmed in part and reversed in part.

Justice MALLETT, joined by Chief Justice CAVANAGH and Justice BOYLE, concurring in part and dissenting in part, agreed that only Representative Dominic Jacobetti had standing to maintain the action, but stated that because § 3 of the State Administrative Board act was implicitly repealed by the passage of the Management and Budget Act, § 393 of the Management and Budget Act is the exclusive means to effect the transfer of funds within a department.

The Management and Budget Act, 1984 PA 431, was adopted

to assert exclusive control over the budget and the regulation of appropriations. The legislative history of the budget and the appropriations process, principles of statutory construction, and common sense mandate the conclusion that when the Legislature expressly repealed § 6 of the State Administrative Board act, it also intended to repeal § 3. Therefore, § 393 of the Management and Budget Act provides the exclusive means of transferring funds within a department.

190 Mich App 260; 475 NW2d 440 (1991) affirmed in part and reversed in part.

STATE — STATE ADMINISTRATIVE BOARD — INTRADEPARTMENTAL TRANSFER OF FUNDS.

The State Administrative Board has the authority to transfer appropriated funds from one program to another within a department of state government under § 3 of the State Administrative Board act (1921 PA 2, MCL 17.3; MSA 3.263).

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *A. Michael Leffler* and *Susan I. Leffler,* Assistant Attorneys General, and *Mary Kay Scullion,* Co-Counsel, for the plaintiffs.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Deborah Anne Devine* and *Thomas C. Nelson,* Assistant Attorneys General, for the defendants.

Amici Curiae:

*Sachs, Waldman, O'Hare, Helveston, Hodges & Barnes, P.C.* (by *Theodore Sachs* and *Mark Brewer),* for Democratic Members of the Appropriations Committees of the Michigan House of Representatives and Senate.

*Goodman, Eden, Millender, Bedrosian* (by *William H. Goodman)* and Legal Services of Southeastern Michigan (by *Robert F. Gillett* and *Steve Gray)* for the League of Women Voters of Michigan, Michigan Trial Lawyers Association, Michigan League for Human Services, Women

Lawyers Association of Michigan, and Sandra Grimm.

GRIFFIN, J. This case presents a challenge by four members of the State Legislature to the authority of the State Administrative Board under § 3 of 1921 PA 2, as amended,[1] to transfer appropriated funds from one program to another within a department of state government. After finding that the legislator plaintiffs have standing to bring this action, the Court of Appeals ruled that the intradepartmental transfer in question was invalid on the ground that the statutory authority relied upon by the board had been impliedly repealed by subsequent legislative acts. While we agree that at least one of the plaintiffs has standing, we disagree that the State Administrative Board's transfer authority was repealed by implication.

I

In 1921, in an effort to promote the efficiency of state government, the Legislature created the State Administrative Board.[2] Currently, the board is composed of six officials.[3] Four are elected: the Governor, the Lieutenant Governor, the Attorney General, and the Secretary of State.[4] The other two, the Superintendent of Public Instruction and the State Treasurer, are appointed.[5]

The State Administrative Board act defines the

---

[1] MCL 17.3; MSA 3.263.

[2] The State Administrative Board act, 1921 PA 2, MCL 17.1 et seq.; MSA 3.261 et seq.

[3] MCL 18.1145; MSA 3.516(145).

[4] Const 1963, art 5, § 21.

[5] Under Const 1963, art 8, § 3 the Superintendent of Public Instruction is appointed by the State Board of Education. Under Const 1963, art 5, § 3 and MCL 12.9; MSA 3.83, the State Treasurer is appointed by the Governor.

powers and duties of the board. Section 3 of the act confers upon the board "general supervisory control over the functions and activities of all administrative departments . . . of the state." Initially, § 6 specifically granted the board control over the system of state accounting. In connection with the performance of its duties, the board exercised authority to transfer appropriated funds within and between departments. In 1931, through an amendment of the act, the Legislature imposed limits upon the board's transfer authority. This legislation precluded the board from transferring funds between departments; however, the amendatory language added to both § 3 and § 6 specifically reserved to the board the authority to transfer funds "within the appropriation for the particular department."[6] Subsequently, the board's control over the system of state accounting was withdrawn and delegated to other state officials.[7] However, the board's supervisory role over state departments continues.

This lawsuit arose from an attempt by the board in May 1991 to effect certain transfers of funds within departments pursuant to the authority set forth in § 3. This attempt followed efforts to deal in other ways with a projected fiscal year 1990-91 deficit of $536 million that confronted the state on January 1, 1991, when Governor Engler took office.

For example, on January 16, 1991, acting under the authority of Const 1963, art 5, § 20 and § 391 of the Management and Budget Act,[8] the Governor submitted for approval by the Senate and House Appropriations Committees a comprehensive proposal that would have reduced state expenditures

---

[6] 1931 PA 6.

[7] 1939 PA 31.

[8] 1984 PA 431, MCL 18.1101 et seq.; MSA 3.516(101) et seq.

by $257 million.[9] This proposal was approved by the Senate committee; however, it was rejected by the House committee.

Shortly thereafter, on February 22, 1991, a supplemental appropriations bill passed by the Legislature was signed by the Governor with significant line-item vetoes, which resulted in a reduction of $23.9 million in general purpose appropriations.[10] However, despite negotiations between executive officials and legislative leaders, the budget crisis persisted and grew more serious in the absence of any comprehensive agreement between the two branches.[11]

In an effort to deal with one phase of the problem, Budget Director Patricia Woodworth in February and March sent three requests to the Senate and House Appropriations Committees,[12] seeking approval for intradepartmental transfers of funds in accordance with § 393(2) of the Management and Budget Act. When, by May 1991, the House Appropriations Committee had taken no action on the requests, Governor Engler called a special meeting of the State Administrative Board for May 9, 1991. Acting under § 3, the board then adopted eleven resolutions providing for the transfer of funds within various departments, including the one resolution still at issue, which would transfer $190,000 within the Department of Natu-

---

[9] Executive Order 1991-5.

[10] 1991 PA 1 appropriated supplemental funds for various departments, including the Departments of Corrections, Mental Health, Public Health, Social Services, and State Police.

[11] By the time this suit was filed on May 10, 1991, the projected deficit for FY 1990-91 had grown to $664 million.

[12] The February requests proposed transfers of funds within the Departments of Corrections and Mental Health; the March request recommended a transfer of funds within the Department of Natural Resources.

ral Resources from the "Clean Michigan Fund" to certain land and water management accounts.[13]

The next day, plaintiffs commenced this action. At the time, plaintiff Lewis Dodak was the Speaker of the House of Representatives, plaintiff Dominic J. Jacobetti was the Chair of the House Appropriations Committee, plaintiff Arthur Miller was the Minority Leader of the Senate, and David S. Holmes, Jr., was the Vice-Chair of the Senate Appropriations Committee. Their suit against the board, the Governor, and several other executive branch officials had not been authorized by either House; plaintiffs brought their action as individual members of the Legislature.

In their amended complaint, plaintiffs maintain that the transfer authority set forth in § 3 had been expressly and impliedly repealed by subsequent enactments, and they claim that § 3 is unconstitutional.[14] As relief, plaintiffs seek a permanent injunction prohibiting implementation of the contested transfers and a declaratory judgment stating that the board has no independent authority to make transfers of appropriated funds within any department.

After the complaint was filed, the parties submitted cross-motions for summary disposition. Granting defendants' motion on May 23, 1991, the circuit court found that plaintiffs lacked standing to sue, and that their statutory and constitutional claims were without merit.

[13] Shortly after this lawsuit began, the Governor and leaders of the Legislature reached a budget agreement. As a result, the State Administrative Board rescinded ten of the eleven resolutions that it had adopted May 9, 1991. For purposes of this appeal, only one transfer resolution remains extant—the resolution transferring funds within the Department of Natural Resources.

[14] Plaintiffs contend that § 3 is an unlawful delegation of legislative authority to the executive branch in violation of Const 1963, art 3, § 2 and art 4, §§ 1, 31. Further, they contend that the transfers exceed the authority of the Governor to reduce state expenditures under Const 1963, art 5, § 20.

On the same day, plaintiffs appealed in the Court of Appeals and filed motions for a stay and for immediate consideration. Granting immediate consideration, the Court enjoined the transfers; however, before the Court of Appeals ruled on the merits of the case, defendants filed an emergency application seeking leave to appeal in this Court. In lieu of granting leave, we ordered the Court of Appeals to expedite its consideration of the case. Thereafter, the Court of Appeals decided that plaintiffs have standing and that the statutory authority relied upon by the board had been impliedly repealed.[15] 190 Mich App 260, 264-265; 475 NW2d 440 (1991). We then granted leave to appeal, 439 Mich 1020 (1992).

II

Before reviewing the Court of Appeals decision that § 3 was impliedly repealed, we first consider defendants' contention that plaintiffs lack standing to bring this action. Standing is a legal term used to denote the existence of a party's interest in the outcome of litigation that will ensure sincere and vigorous advocacy. However, evidence that a party will engage in full and vigorous advocacy, by itself, is insufficient to establish standing. Standing requires a demonstration that the plaintiff's substantial interest will be detrimentally affected in a manner different from the citizenry at large. *Alexander v Norton Shores,* 106 Mich App 287; 307 NW2d 476 (1981).

Here, plaintiffs claim standing on the basis of their status as legislators. In their complaint, they allege that the transfer actions of the board reduced their effectiveness as legislators and nulli-

---

[15] The Court of Appeals did not reach plaintiffs' constitutional claims. Nor did the plaintiffs brief or argue those claims in this Court.

fied the effect of their votes. Plaintiffs claim that the board's actions interfered with the authority of plaintiffs Jacobetti and Holmes as members of the House and Senate Appropriations Committees to approve or disapprove intradepartmental transfers under § 393 of the budget act. In addition, it is contended that the board's actions diminished the effectiveness of plaintiffs Dodak and Miller who, as leaders, appoint members of their party to positions on the respective appropriations committees.[16] Finally, plaintiffs allege that the board's actions eliminated the need for the Governor to exercise his line-item veto power, thereby taking away the opportunity for plaintiffs to participate in a vote to override such a veto.

Under limited circumstances, the standing of legislators to challenge allegedly unlawful executive actions has been recognized in the federal courts. See, e.g., *Coleman v Miller,* 307 US 433; 59 S Ct 972; 83 L Ed 1385 (1939); *Kennedy v Sampson,* 167 US App DC 192; 511 F2d 430 (1974); *Dennis v Luis,* 741 F2d 628 (CA 3, 1984). However, to establish standing, a legislator must overcome a heavy burden. Courts are reluctant to hear disputes that may interfere with the separation of powers between the branches of government. In *Goldwater v Carter,* 444 US 996, 997; 100 S Ct 533; 62 L Ed 2d 428 (1979), Justice Powell explained the basis for noninvolvement by the judiciary in such cases:

> Differences between the President and the Congress are commonplace under our system. The differences should, and almost invariably do, turn on political rather than legal considerations. The Judicial Branch should not decide issues affecting the allocation of power between the President and

[16] See House Rule 7; Senate Rules 1.104, 1.105.

Congress until the political branches reach a constitutional impasse. Otherwise, we would encourage small groups or even individual Members of Congress to seek judicial resolution of issues before the normal political process has the opportunity to resolve the conflict.

We agree. It would be imprudent and violative of the doctrine of separation of powers to confer standing upon a legislator simply for failing in the political process. For these reasons, plaintiffs who sue as legislators must assert more than "a generalized grievance that the law is not being followed . . . ." *Chiles v Thornburgh,* 865 F2d 1197, 1208 (CA 11, 1989). Instead, they must establish that they have been deprived of a "personal and legally cognizable interest peculiar to [them]." *Dennis, supra,* 741 F2d 631.

In this case, plaintiffs maintain that they have met this burden. In support of their argument, they rely on *Coleman v Miller.* There, a group of Kansas legislators challenged the power of the lieutenant governor to cast the tie-breaking vote in favor of a resolution adopting a proposed amendment of the federal constitution. The Court found that the legislators had standing to bring the action:

> We think that these senators have a plain, direct and adequate interest in maintaining the effectiveness of their votes. . . . They have set up and claimed a right and privilege under the Constitution of the United States to have their votes given effect and the state court has denied that right and privilege. [307 US 438. See also *Kennedy v Sampson, supra,* 167 US App DC 198 (no more essential interest could be asserted by a legislator than to vindicate the effectiveness of his vote).]

Defendants respond that plaintiffs have not demonstrated any direct injury as a result of defendants' conduct. They argue that cases in which actions of the executive branch have specifically interfered with the legislative process are distinguishable from those in which executive actions are challenged simply as an improper execution of the law. For example, in *Thornburgh, supra,* a senator sued alleging that a federal detention facility was being run illegally. Finding that the senator lacked standing, the court concluded that "a Congressman only has standing if he alleges a diminution of congressional influence which amounts to a complete nullification of his vote, with no recourse in the legislative process." 865 F2d 1207.

For additional support, defendants rely on Michigan authority, *Killeen v Wayne Co Rd Comm,* 137 Mich App 178, 189; 357 NW2d 851 (1984), wherein the Court of Appeals concluded that various government officials lacked standing to sue. The plaintiff group in *Killeen* included members of the Wayne County Board of Commissioners, two members of the Wayne County Charter Commission, and a state senator. They claimed standing to challenge the lawfulness of an agreement between the board of county road commissioners and a newly formed labor organization on the ground that the agreement nullified their respective legislative powers. The Court disagreed: "[T]he respective votes of Senator Hertel and charter commissioners Ward and Barnes have been counted, and their legislative work-product enacted; at this juncture their special interest as lawmakers has ceased." 137 Mich App 189. For this reason, the

Court concluded that they did not have standing to sue.[17]

In the case before us, defendants contend that the legislative work on which plaintiffs rely had been completed. The Legislature passed the Management and Budget Act. At this point, whether separate authority exists in the board to transfer funds within a department is a matter of statutory construction. If the Legislature disagrees with the board's claim of transfer power under § 3, it can work a political resolution of the disagreement by expressly repealing § 3.

Recognizing this limitation, plaintiffs argue that their claim is more than a generalized assertion that the board is failing to follow the law. Instead, plaintiffs Jacobetti and Holmes contend that, as members of the legislative appropriations committees, they have a specific supervisory responsibility in connection with intradepartmental transfers. MCL 18.1391(3); MSA 3.516(391)(3). By failing to follow transfer procedures set forth in the Management and Budget Act, plaintiffs claim that the board has denied them "their lawful right to approve or disapprove the transfers in question."[18]

Plaintiffs rely on *American Federation of Gov-*

---

[17] In his concurrence in *Moore v United States House of Representatives*, 236 US App DC 115; 733 F2d 946 (1984), Judge Scalia presented a similar view. There, he concluded that legislators did not have standing to sue on the basis of the alleged improper enforcement of a particular statute:

> [A] proper understanding of the doctrine of separation of powers suggests that the personal desires of legislative and executive officers to exercise their authority are not within the "zone of interests" protected by the provisions of the Constitution and laws conferring such authority. Only the interests of particular individuals who would be aided by the exercise of that authority—and have been harmed by its unlawful deprivation—come within that zone, since the authority was conferred for the benefit not of the governors but of the governed. [236 US App DC 129. Citation omitted.]

[18] First amended complaint, ¶ 29.

*ernment Employees v Pierce,* 225 US App DC 61; 697 F2d 303 (1982). In *Pierce,* Representative Sabo sued in his capacity as a legislator and as a member of the House Appropriations Committee. He challenged a reduction in force that was to be implemented by the Secretary of Housing and Urban Development. The court determined that Sabo did not have standing as a legislator because, in that capacity, his grievance was a general one about the proper execution of a law "which lacks the specificity to support a claim of standing." *Id.* at 63. However, the court did find that Sabo had standing as a member of the appropriations committee:

> In the present case, the Appropriation Act gave Congressman Sabo the right, as a member of the Appropriations Committee, to participate in approval of any reorganization of HUD conducted before January 1, 1983. The Secretary's actions injured him by depriving him of that specific statutory right to participate in the legislative process. [*Id.*][19]

Although this Court is not bound to follow federal cases regarding standing,[20] we agree that *Pierce* lends support at least for the standing claim of plaintiff Jacobetti as a member of the

[19] Similarly, in *Romulus City Treasurer v Wayne Co Drain Comm'r,* 413 Mich 728; 322 NW2d 152 (1982), we considered the standing of township and city treasurers, acting in their official capacities, to challenge the actions of the Wayne County Drain Commissioner. Although we determined that under "extraordinary circumstances" plaintiffs may have standing, we held that in their official capacities the treasurers did not have standing to sue because there was no statutory authority that allowed the treasurers to review the actions of the drain commissioner. 413 Mich 742.

[20] One notable distinction between federal and state standing analysis is the power of this Court to issue advisory opinions. Const 1963, art 3, § 8. Under Article III of the federal constitution, federal courts may issue opinions only where there is an actual case or controversy. See *Pennell v San Jose,* 485 US 1, 8-9; 108 S Ct 849; 99 L Ed 2d 1 (1988).

House Appropriations Committee.[21] As in *Pierce,* plaintiff Jacobetti has been denied a specific statutory right sufficient to confer standing. If, for purposes of considering this claim, we assume arguendo that § 3 of the State Administrative Board act was impliedly repealed,[22] then intradepartmental transfers could be made only by the state budget director in accordance with § 393 of the Management and Budget Act. That act confers upon plaintiff Jacobetti a right to approve or disapprove such transfers. Under these circumstances, the board's actions, if recognized, would deprive plaintiff Jacobetti "of that specific statutory right to participate in the legislative process." *Pierce* at 63.

On the other hand, the standing claim of plaintiff Holmes is deficient even though he also is an appropriations committee member. In contrast to plaintiff Jacobetti, plaintiff Holmes did have the opportunity to vote on the transfer that is being disputed in this case. As earlier noted, pursuant to the Management and Budget Act, State Budget Director Woodworth proposed a transfer of funds within the Department of Natural Resources on March 27, 1991. That transfer involved the same DNR accounts as the transfer at issue in this case. The Senate Appropriations Committee approved the transfer.[23] Consequently, Senator Holmes, un-

[21] Michigan courts previously have relied upon federal authority when deciding standing questions. See *Killeen, supra; License Beverage Ass'n v Behnan Hall, Inc,* 82 Mich App 319, 324-325; 266 NW2d 808 (1978); *White Lake Ass'n v Whitehall,* 22 Mich App 262, 273; 177 NW2d 473 (1970); *Fieger v Ins Comm'r,* 174 Mich App 467, 471; 437 NW2d 271 (1988).

[22] For purposes of determining a plaintiff's standing, all pleaded allegations are to be accepted as true. *Warth v Seldin,* 422 US 490, 501; 95 S Ct 2197; 45 L Ed 2d 343 (1975).

[23] As approved, the transfer would have taken $200,000 from the Clean Michigan Fund and transferred it to two separate land and water management accounts.

like Representative Jacobetti, is not suing to maintain the effectiveness of his vote under the Management and Budget Act; rather, he is suing to reverse the outcome of a political battle that he lost.

In addition, we find no basis for the contention that the board's actions have interfered with the appointment authority of House Speaker Dodak or Senate Minority Leader Miller. Likewise, we are not persuaded by plaintiffs' argument that the board's actions have affected the Governor's line-item veto authority or the power of members of the Legislature to override such a veto.[24] For these reasons, we conclude that only plaintiff Jacobetti, in his capacity as an individual member of the House Appropriations Committee has demonstrated a personal injury sufficient to confer standing to sue.[25]

Having determined that at least one of the plaintiffs has standing, we turn next to the question whether § 3 of the State Administrative Board

[24] Const 1963, art 5, § 19.

[25] Defendants argue alternatively that if this Court concludes that plaintiffs have standing to sue, the Court still should not hear the case on the basis of the federal doctrine of equitable discretion. The basis of this doctrine was explained by the court in *Riegle v Federal Open Market Committee*, 211 US App DC 284, 292; 656 F2d 873 (1981):

Where a congressional plaintiff could obtain substantial relief from his fellow legislators through the enactment, repeal, or amendment of a statute, this court should exercise its equitable discretion to dismiss the legislator's action.

We are conscious of the separation of powers concerns that have been raised. However, as defendants conceded in their brief in the Court of Appeals, this case involves an important question of continuing public interest that should be resolved by this Court. Further, it is unlikely that a private plaintiff could assert the claims that plaintiff Jacobetti now makes. Thus, we decline in this case to invoke the federal doctrine of equitable discretion without intimating its possible applicability in a future case.

act, as amended, was impliedly repealed by subsequent acts of the Legislature.

### III

Courts within this state and throughout the country are reluctant to conclude that a statute has been repealed by implication. Numerous Michigan decisions have emphasized that

"[t]he presumption is always against the intention to repeal where express terms are not used, and the implication, in order to be operative, must be necessary. Repeals by implication are not favored and will not be indulged in if there is any other reasonable construction. The intent to repeal must very clearly appear, and courts will not hold to a repeal if they can find reasonable ground to hold the contrary." [*Attorney General ex rel Owen v Joyce,* 233 Mich 619, 621; 207 NW 863 (1926) (citations omitted); see also *Jackson v Michigan Corrections Comm,* 313 Mich 352; 21 NW2d 159 (1946); *Rathbun v Michigan,* 284 Mich 521; 280 NW 35 (1938); *Old Orchard by the Bay Associates v Hamilton Mutual Ins Co,* 434 Mich 244; 454 NW2d 73 (1990).]

The law in Michigan accords with decisions of courts in other jurisdictions. See, e.g., *Morton v Mancari,* 417 US 535, 549; 94 S Ct 2474; 41 L Ed 2d 290 (1974); *Davis v Devine,* 736 F2d 1108, 1114 (CA 6, 1984); *Paulson v Pierce Co,* 99 Wash 2d 645; 664 P2d 1202 (1983); *Vermont v Foley,* 140 Vt 643; 443 A2d 452 (1982).

The basis of the presumption against implied repeals is explained by Sutherland in his treatise on statutory construction:

The presumption against implied repeals is founded upon the doctrine that the legislature is

presumed to envision the whole body of the law
when it enacts new legislation. Therefore, the
drafters should expressly designate the offending
provisions rather than leave the repeal to arise by
implication from the later enactment. There is
also the assumption that existing statutory and
common law is representative of the popular will.
This would reinforce the presumption against
their alteration or repeal. [1A Singer, Sutherland
Statutory Construction (4th ed), § 23.10, p 346.]

Despite the presumption against it, occasionally
courts will determine that a statute has been
repealed by implication. *Old Orchard v Hamilton
Ins, supra,* 434 Mich 257. This Court has held that
a repeal may be inferred in two instances: 1) when
it is clear that a subsequent legislative act conflicts
with a prior act, or 2) when a subsequent act of
the Legislature clearly is intended to occupy the
entire field covered by a prior enactment. *Washte-
naw Co Rd Comm'rs v Public Service Comm,* 349
Mich 663, 680; 85 NW2d 134 (1957). In either
situation the burden on the party claiming an
implied repeal is a heavy one, because the inten-
tion of the Legislature to repeal a statute must be
"clear." *Id.*

In this case, the Court of Appeals held in the
alternative that § 3 had been impliedly repealed
by the 1976 amendments of § 6 of the State Ad-
ministrative Board act, or by enactment in 1984 of
the Management and Budget Act. We consider
each of these conclusions in turn.

A

To understand the argument that § 3 was im-
pliedly repealed by the 1976 amendments of § 6, it
is necessary to recount some history concerning
the board's transfer authority.

As earlier noted, an amendment in 1931 of the State Administrative Board act restricted transfer authority in other respects; however, it specifically reserved to the board the power to "inter-transfer funds within the appropriation for the particular department." Similar language to achieve this purpose was added in §§ 3 and 6.[26] Although both sections of the State Administrative Board act then shared this transfer language, each had a distinct purpose: § 3 conferred upon the board a general grant of supervisory control over "all administrative departments, boards, commissioners, and officers of the state, and of all state institutions," whereas § 6 granted the board authority to oversee state accounting, architectural services, and the construction of state buildings. 1921 PA 2.

In 1939, § 6 was amended by 1939 PA 31. That amendment removed the board's control over the system of state accounting; however, at that stage the board's authority to transfer funds within a department remained in § 6 and was identical to the transfer language in § 3.

Subsequently, in 1976, an amendment imposing restrictions upon the transfer authority in § 6 was

[26] The amendment added by 1931 PA 6 reads:

Provided, however, The said board shall not have power to transfer any appropriation to the general fund at any time or use the same for any purpose other than that designated by the legislature: Provided further, That said board shall not have power to allow to any state department, board, commission, officer or institution any funds, not appropriated therefor by the legislature, from any source whatever, except as provided in the emergency appropriation act of nineteen hundred thirty-one; and said administrative board shall not have the power to transfer to any state department, board, commission, officer or institution any sum from the amount appropriated by the legislature for any other purpose, *except to inter-transfer funds within the appropriation for the particular department,* board, commission, officer or institution. [Emphasis added.]

enacted. As amended by 1976 PA 120, § 6 then read in pertinent part:

(1) The state administrative board shall not transfer to any state department, board, commission, officer or institution any sum from the amount appropriated by the legislature for any other purpose, except to intertransfer funds within the appropriation for the particular department, board, commission, officer, or institution.

(2) Intertransfers of appropriations for any particular department or institution, shall not be made which will increase or decrease an item of appropriation by more than 3% or $30,000.00 whichever is greater, and in no case shall any item of appropriation be increased or decreased by more than $50,000 in the aggregate. . . .

(3) Intertransfers of appropriations for any particular department or institution in excess of the restrictions in subsection (2) may be made by the state administrative board only after approval by the house and senate appropriations committees.

Later, in 1984, when the Legislature passed the Management and Budget Act, the amended § 6 was expressly repealed by § 591 of that act. However, § 3 was left untouched. See MCL 18.1101 *et seq.*; MSA 3.516(101) *et seq.,* and MCL 17.3; MSA 3.263.

The Court of Appeals concluded that the restrictions imposed on the board's transfer authority in 1976 were "clearly repugnant to the unrestricted authorization to intertransfer funds contained in § 3 and relied upon by defendants." 190 Mich App 276. Consequently, the Court held that "the 'intertransfer' language in § 3 was impliedly repealed by 1976 PA 120." *Id.*

Of course, it is true that after the 1976 amendments of § 6, the board, at least for a period of time, did not possess unlimited power to transfer

funds within departments. However, it does not follow that the general transfer power in § 3 was repealed by implication. The 1976 amendment of § 6 did not eliminate the board's transfer authority; rather, that legislation expressly recognized the board's authority, but circumscribed it with certain restrictions or exceptions concerning its exercise. To be sure, the general power provided in § 3 was then limited by restrictions in § 6, but only for as long as those restrictions remained in effect. Once those restrictions were later removed in 1984 by repeal of § 6, the board was empowered to exercise the transfer authority as set forth in § 3.

Our analysis is reinforced by this Court's decision in *Dykstra v Holden,* 151 Mich 289; 115 NW 74 (1908). There, a mandamus action was instituted to compel a call for a primary election in Grand Rapids in accordance with 1895 PA 135, a general act controlling primary elections in cities. The general act applied to Grand Rapids until 1901 when the Legislature passed special legislation that exempted elections in Kent and certain other counties.[27] However, that law was later repealed, and the question presented was whether the repeal made the general law applicable.

It was asserted that the general law had been repealed to the extent of its conflict with the subsequent special legislation. Rejecting that argument, the *Dykstra* Court said that the subsequent legislation did not partially repeal the general law:

> It merely exempted the city of Grand Rapids from the operation of said general law, and when the local act was repealed there was nothing to prevent the application of the general law, and it did apply. [151 Mich 293.]

[27] 1901 LA 471.

The *Dykstra* Court followed a fundamental rule of statutory construction that " '[b]y the repeal of the act creating the exception, the general statute which was in force all the time then becomes applicable to all cases, according to its terms.' " *Id.* (Citation omitted.)[28] Likewise, in this case, when § 6 was repealed, the restrictions in that section were no longer in force and the transfer authority in § 3 became applicable according to its terms.

Finding no implied repeal of § 3 by the 1976 amendments of § 6, we turn now to the issue whether § 3 was impliedly repealed by the Management and Budget Act.

B

Of course, our inquiry into the Legislature's intent when it passes a statute does not begin with committee reports or legislative analysis; rather, " '[t]he starting point in every case involving construction of a statute is the language itself.' " *Int'l Brotherhood of Teamsters v Daniel,* 439 US 551, 558; 99 S Ct 790; 58 L Ed 2d 808 (1979) (citation omitted). In this lawsuit, there is no claim that the transfer language in § 3 is ambiguous. Unless it has been repealed, § 3 clearly gives the board authority to transfer funds within a department.

However, the Court of Appeals found conflict

---

[28] As stated by the Supreme Court of California in *People v Mitchell,* 27 Cal 2d 678, 684; 166 P2d 10 (1946) (en banc):

" 'The statutory rule against the revival of a statute by the repeal of a repealing act relates to absolute repeals, and not to cases where a statute is left in force and all that is done in the way of repeal is to except certain cases from its operation. In such cases the statute does not need to be revived, for it remains in force, and the exception being taken away, the statute is afterwards to be applied without the exception . . . .' "

between § 3 and § 393 of the Management and Budget Act, which reads in part:

> (1) Administrative transfers of appropriations within any department to adjust for current cost and price variations from the enacted budget items, or to adjust amounts between federal sources of financing, may be made by the state budget director not less than 30 days after notifying the senate and house appropriations committees. Administrative transfers shall not include adjustments that have policy implications or that have the effect of creating, expanding, or reducing programs within that department. Those transfers may be disapproved by either appropriations committee within the 30 days and, if disapproved within that time, shall not be effective.
>
> (2) A transfer of appropriations within any department for reasons other than cost and price variances from those appropriations as enacted into law shall not be made by the state budget director unless approved by both appropriations committees. If the budget director does not approve transfers adopted by both appropriations committees under this subsection, the budget director shall notify the appropriations committees of his or her action within 15 days. [MCL 18.1393; MSA 3.516(393).]

Finding § 3 "to be inconsistent with the Management and Budget Act," the Court of Appeals concluded that "the Legislature intended to repeal [§ 3]." 190 Mich App 274. We disagree.

When two statutes address the same subject, courts must endeavor to read them harmoniously and to give both statutes a reasonable effect. *Endykiewicz v State Hwy Comm,* 414 Mich 377, 385; 324 NW2d 755 (1982). As this Court explained in *Rathbun:*

> "The legal presumption is that the legislature did not intend to keep really contradictory enact-

ments in the statute books, or to effect so important a measure as the repeal of a law without expressing an intention to do so. An interpretation leading to such a result should not be adopted unless it is inevitable." [284 Mich 544. Citation omitted.]

Although we agree that § 3 and § 393 do relate to the same subject—transfers of funds within a department—we disagree with the Court of Appeals conclusion that the two sections are in "inevitable" conflict.

First, the transfer authority in § 393 is granted to the budget director while the transfer authority in § 3 is granted to the administrative board. The budget director and the board do not have the same duties: the primary duty of the budget director is to "plan and prepare a comprehensive executive state budget and execute, manage, and control the state budget which is enacted into law."[29] In contrast, the State Administrative Board exercises general supervisory control over the various departments. It is reasonable to conclude that the Legislature determined that either of these separate entities might need to transfer funds within a department in order to perform its separate duties.

Indeed, such a conclusion is consistent with the approach taken by the Legislature when the State Administrative Board was created. As already noted, initially the board had dual responsibilities: it exercised general supervisory control over all state departments (§ 3), and it controlled the system of state accounting (§ 6). In each section, consistent with these powers, the Legislature reserved to the board the authority to transfer funds within departments. Even after the board's control over state accounting was taken away in 1939, the board's authority to order intradepartmental

[29] MCL 18.1341; MSA 3.516(341).

transfers was maintained.[30] It appears that the Legislature considered the authority to transfer funds within departments as necessarily correlative to the board's function of supervising those departments. Likewise, it appears that the Legislature considered such transfer power necessarily correlative to the task of administering the state's budget.

Second, looking again to the relationship between § 393 and § 3, not only do the budget director and the board have different duties, they utilize different decision-making procedures and they operate under different levels of accountability to the electorate. The budget director is appointed by the Governor and serves at the Governor's pleasure.[31] The director has been granted authority to effect significant transfers only with the approval of committees of the Legislature. By contrast, most of the members of the administrative board are elected in statewide elections. The board can authorize transfers only if a majority of the board agrees. As we read the two transfer sections (§ 393 and § 3), it is apparent that the Legislature has granted greater transfer authority to one entity that must deliberate and reach a consensus before acting and whose members are more directly accountable to the electorate. On the other hand, a much restricted transfer authority has been

---

[30] As the Attorney General noted in Opinion No. 4896, before the 1976 amendments of § 6 the board's unrestricted authority to transfer funds within departments was well established:

> It is apparent from the reading of the three sections involved [§§ 3, 6, and 9 of the Department of Administration Act, 1948 (Ex Sess) PA 51] that the State Administrative Board has authority to intertransfer without the limitations expressed in Section 9 [of Enrolled House Bill 4439]. [OAG 1975-1976, No 4896, pp 133, 143 (September 9, 1975).]

[31] MCL 18.1321; MSA 3.516(321).

granted to the budget director, who is not directly accountable to the electorate. Nothing in such an arrangement is unreasonable.

Third, to the extent that the transfer powers of the board and the budget director overlap, the Legislature has put in place a mechanism to prevent conflicting exercises of transfer authority. The Governor may veto any board action with which he disagrees. Moreover, the budget director serves at the pleasure of the Governor. Given the Governor's supervisory role over both means of effecting transfers, it is reasonable to conclude that conflicting transfers will not be authorized by the executive branch.

Plaintiffs dismiss such a construction of the statute as illogical. They assert that, over the years the Legislature has acted several times to curtail the board's power, particularly in 1976 when it restricted the board's transfer authority. In light of this history, plaintiffs claim that the Legislature surely could not have intended to restore the board's transfer authority when it passed the Management and Budget Act. We are not persuaded by this argument. It may be true that in 1976 the Legislature was convinced that the transfer authority of the board was too broad. However, we refuse to assume that the Legislature's motivation in 1976, when it enacted restrictions on that authority, mirrored its motivation in 1984 when it repealed those restrictions. Whatever the goals of the Legislature may have been in 1976, certainly a subsequent Legislature, composed of different elected officials, could have had a different goal.

More important, as noted above, when faced with two statutes that bear on the same subject, our task is not to discern the most logical construction of the more recent statute, but to "labor

to permit the survival of both enactments if possible." *Davis v Devine, supra,* 736 F2d 1112. We will not infer the repeal of a statute by a subsequent enactment except when the two acts are "so incompatible that both cannot stand." *In re Reynolds Estate,* 274 Mich 354, 360; 264 NW 399 (1936).

Our approach is consistent with that taken by the United States Supreme Court in *Tennessee Valley Authority v Hill,* 437 US 153; 98 S Ct 2279; 57 L Ed 2d 117 (1978). The Court there considered whether a certain portion of the Endangered Species Act was impliedly repealed by appropriations made by Congress for construction of a dam in the Tennessee Valley. When the Endangered Species Act was passed, the dam already was being built. Over $50 million had been spent on the project. After passage of the Endangered Species Act, construction continued, as well as appropriations to fund the construction, even though construction of the dam violated the Endangered Species Act. The Court held that there was no implied repeal of the applicable section of the act, despite the seemingly inconsistent act of Congress appropriating funds for the dam's construction:

> We agree with the Court of Appeals that in our constitutional system the commitment to the separation of powers is too fundamental for us to pre-empt congressional action by judicially decreeing what accords with "common sense and the public weal." Our Constitution vests such responsibilities in the political branches. [437 US 195.]

Likewise, in this case it is of no consequence that the two sections dealing with the transfer of funds may seem redundant to some, as long as they are not in irreconcilable conflict. The statutes can reasonably be read so that they are not.

As an alternative basis for their claim that the Management and Budget Act repealed § 3 by implication, plaintiffs have also argued that the Management and Budget Act "was enacted as a comprehensive revision and consolidation of the laws relating to budgeting, accounting, and the regulating of appropriations." They contend that the subject matter of § 3 was addressed completely in the Management and Budget Act, and that it is appropriate therefore to infer a repeal of § 3. The Court of Appeals agreed. It found that "the Legislature intended the Management and Budget Act to occupy the whole field of the budget process, and in particular intended § 393 to provide the exclusive means of transferring appropriations within any department." 190 Mich App 274. Again, we disagree. Nothing in the text of the Management and Budget Act suggests that the Legislature intended to eliminate the administrative board's power to transfer funds within a department. In fact, the text of the act suggests the opposite.

When a legislature expressly states which of several provisions in a statute it intends to repeal, the presumption is even stronger that it does not intend to repeal the provisions that remain. See, e.g., *Washtenaw Co Rd Comm'rs, supra,* 349 Mich 681; *Davis v Devine, supra,* 736 F2d 1112; *Paulson v Pierce Co, supra* at 650-651; *United States v Hansen,* 249 US App DC 22, 27; 772 F2d 940 (1985). In § 591 of the Management and Budget Act the Legislature expressly states what it intends to repeal. In that section, the Legislature lists thirty-six different public acts that are partially or wholly repealed by the Management and Budget Act. Section 6 of the State Administrative Board act is listed among the provisions that are repealed; § 3 is not.

Even so, § 3 is not ignored in the Management and Budget Act. Instead, suggesting the Legislature's awareness of its existence and content, § 3 is specifically referred to in § 145 of that act.[32]

As we read the Management and Budget Act, it is clear that the Legislature chose to repeal § 6, and it chose not to repeal § 3. When the Legislature performs such "deliberate legislative surgery" on a statute,[33] we decline to find a repeal by implication. As we said in *Washtenaw Co Rd Comm'rs, supra,* 349 Mich 681: " 'The rule of implied repeal is clearly inapplicable also where the revising statute declares what effect it is intended to have upon the former law . . . .' "

The rule is particularly inappropriate where the Legislature's attention to a subject is as detailed as it was in this case. As the repealer section shows, when the Legislature enacted the Management and Budget Act it reviewed a multitude of prior enactments and specified which parts of those enactments were repealed. Given this comprehensive review, we find it doubtful, to say the least, that the Legislature could have by accident or oversight failed to repeal the transfer language of § 3 if that is what it had intended to do. Indeed, during oral argument, plaintiffs' counsel conceded that he had no explanation for the Legislature's failure to repeal § 3; his personal theory was that the section "just got by them."

The transfer language in § 3 has existed since

---

[32] Section 145(4) provides:

> The state administrative board created under Act No. 2 of the Public Acts of 1921, being sections 17.1 to 17.3 of the Michigan Compiled Laws, is transferred as an organizational entity, together with all of its records, staff, property, and funds, to the department [of management and budget].

[33] See *Vermont v Foley, supra,* 140 Vt 648.

1931. It has never been expressly repealed, despite regular and detailed attention to legislation that focused on the task of formulating and balancing the state's budget. To now disregard the unambiguous language of that section on the basis that it has been impliedly repealed would be an "extraordinary step." *Smith v Smith,* 433 Mich 606, 641; 447 NW2d 715 (1989) (dissenting opinion of CAVANAGH, J.). Such a step is to be taken only when the legislative intent is clear. In this case, it is not.

IV

For the foregoing reasons, we disagree with plaintiffs claim that § 3 of the State Administrative Board act was repealed by implication. The decision of the Court of Appeals is affirmed in part and reversed in part.

LEVIN, BRICKLEY, and RILEY, JJ., concurred with GRIFFIN, J.

MALLETT, J. (*concurring in part and dissenting in part*). We concur with the majority's holding that only Representative Jacobetti has standing to maintain the suit. We respectfully dissent, however, with the majority's conclusion that § 3 was not implicitly repealed. The majority's holding overlooks the Legislature's intent as evidenced by the continual diminution of the state administrative board's powers since 1921.

I

Defendants contend that § 3 of the State Administrative Board act, MCL 17.3; MSA 3.263, authorized the board to transfer funds within an appropriation for a particular department without prior legislative approval. Section 3 provides:

> The state administrative board shall exercise general supervisory control over the functions and activities of all administrative departments, boards, commissioners and officers of the state, and of all state institutions: Provided, however, The said board shall not have power to transfer any appropriation to the general fund at any time or use the same for any purpose other than that designated by the legislature: Provided further, That said board shall not have power to allow to any state department, board, commission, officer or institution any funds, not appropriated therefor by the legislature, from any source whatever, except as provided in the emergency appropriation act of . . . [1931]; and said administrative board shall not have the power to transfer to any state department, board, commission, officer or institution any sum from the amount appropriated by the legislature for any other purpose, *except to inter-transfer funds within the appropriation for the particular department, board, commission, officer or institution.* [Emphasis added.]

Plaintiffs argue that the section was implicitly repealed and that fund transfers within a department are exclusively governed by the Management and Budget Act, MCL 18.1101 *et seq.*; MSA 3.516(101) *et seq.* Plaintiffs point, in particular, to §§ 391 and 393. Section 391 provides:

> (1) When it appears to the governor, based upon written information received by the governor from the budget director and the department of treasury, that actual revenues for a fiscal period will fall below the revenue estimates on which appropriations for that period were based . . . the governor shall order the director to review all appropriations made by the legislature, except those made for the legislative and judicial branches of government or from funds constitutionally dedicated to specific purposes.
>
> (2) . . . The governor shall review the recommendations of the director and shall prepare an order containing reductions in expenditures

authorized so that actual revenues for the fiscal period will be sufficient to equal the expenditures. . . .

(3) Not later than 10 days after the submission of the order to the appropriations committees, *each appropriation committee by vote of a majority of its members elected and serving shall approve or disapprove the order.* . . .

(4) If either appropriation committee disapproves the order, *the order is without force and effect.* [Emphasis added.]

Section 393 further provides:

(1) Administrative transfers of appropriations within any department to adjust for current cost and price variations from the enacted budget items, or to adjust amounts between federal sources of financing, may be made by the state budget director not less than 30 days after notifying the senate and house appropriations committees. . . . *Those transfers may be disapproved by either appropriations committee within the 30 days and, if disapproved within that time, shall not be effective.*

(2) A transfer of appropriations within any department for reasons other than cost and price variances from those appropriations as enacted into law *shall not be made by the state budget director unless approved by both appropriations committees.* [Emphasis added.]

Undoubtedly, the Management and Budget Act required the budget director to obtain the consent of the House and Senate Appropriations Committees to effect a transfer of funds within the appropriation for a particular department. Meanwhile, the State Administrative Board act apparently similarly permitted the board to transfer funds without the consent of the appropriations committees. In 1984, however, when the Legislature materially revised the Management and Budget Act, it specifically repealed § 6 of the State Administra-

tive Board act, but failed to address § 3.[1] MCL 18.1591; MSA 3.516(591). The question then is whether the "intertransfer funds" clause in § 3 of the State Administrative Board act survived the express repeal of § 6 and the enactment of other procedures for transferring funds intradepartmentally.

Defendants argue that § 393 simply provided an alternate means for transferring funds and that nothing indicates that it was intended as the sole procedure. Simply stated, they assert that §§ 3 and 6 are two separate and alternative means for the intratransfer of funds. Conversely, plaintiffs contend that since 1931, the Legislature has steadily curtailed the board's authority to effect the intratransfer of funds. Therefore, the only reasonable conclusion is that the 1984 amendment of the Management and Budget Act implicitly repealed the board's authority to effect the intratransfer of funds under the State Administrative Board act.

We find the defendants' arguments unpersuasive. Although repeals by implication are disfavored, the determinative inquiry is whether the Legislature intended a subsequently enacted statute to repeal an earlier one. *Old Orchard by the Bay Associates v Hamilton Mutual Ins Co,* 434 Mich 244, 257; 454 NW2d 73 (1990). We find that the Legislature intended § 393 of the Management and Budget Act to furnish the sole method of transferring funds within a department. This conclusion is mandated by the inconsistent natures of § 393 and § 3 and the continual diminution of the board's power to effect the intratransfer of funds. Accordingly, we would hold that the Legislature implicitly repealed the intratransfer power of § 3.

---

[1] Section 6(5), MCL 17.6(5); MSA 3.265(5), which granted the board "control over the system of state accounting" was amended three times without reference to § 3. See 1939 PA 31; 1976 PA 120; 1984 PA 431, § 591.

In *Detroit v Michigan Bell Telephone Co,* 374 Mich 543, 558; 132 NW2d 660 (1965), we addressed the interpretation of statutes relating to the same subject.

> Statutes *in pari materia* are those which relate to the same person or thing, or the same class of persons or things, or which have a common purpose. It is the rule that in construction of a particular statute, or in the interpretation of its provisions, all statutes relating to the same subject, or having the same general purpose, should be read in connection with it, as together constituting one law, although enacted at different times, and containing no reference one to the other.

Furthermore, statutory construction rules direct that absent an express repeal, the two statutes must be read in conformity.

> "Statutes *in pari materia* are to be construed together, and repeals by implication are not favored. The courts will regard all statutes upon the same general subject-matter as part of one system, and later statutes should be construed as supplementary or complementary to those preceding them."
> "The object of the rule *in pari materia* is to carry into effect the purpose of the legislature as found in harmonious statutes on a subject." [*Wayne Co v Auditor General,* 250 Mich 227, 232-233; 229 NW 911 (1930). Citations omitted.]

Section 3 of the State Administrative Board act, which defendants claim conferred on the board general power to effect the intratransfer of funds, cannot be read consistently with § 393 of the Management and Budget Act. It is difficult to conceive that the Legislature did not intend to confer the power to effect the intratransfer of funds on the

budget director, subject to legislative approval, and simultaneously grant the same authority to the board without limitation or legislative oversight.

This is more than patchwork legislation. The rules of statutory construction, as adopted by this Court, mandate that the applicable statutes be read together. However, to do so would result in an interpretation clearly not intended by the Legislature.[2] Failure to hold that § 3 was implicitly repealed would allow the executive branch to choose a forum for intradepartment transfers. That option was certainly not intended by the Legislature and therefore, § 3 must fail. A contrary holding would allow the administrative board to circumvent the Management and Budget Act's requirement of prior legislative approval.

The majority argues that the two sections, §§ 3 and 393, are not in inevitable conflict because § 3 grants transfer authority to the administrative board, whereas § 393 grants similar power to the budget director. This reasoning does not follow when one realizes that the Governor controls both bodies. The State Administrative Board is composed of the Governor, lieutenant governor, secretary of state, state treasurer, attorney general, and superintendent of public instruction. MCL 18.1145(4); MSA 3.516(145)(4). None of the board's members is authorized to individually transfer funds. They are only empowered to vote on fund transfer proposals as members of the board. However, through appointment or otherwise, the Governor controls at least three members (the Governor himself, the lieutenant governor, and the state treasurer) of the six-member board. As a result of this control, the board cannot transfer funds without the Governor's consent; the requisite votes are

---

[2] One cannot do indirectly what one cannot do directly.

lacking. Likewise, the budget director is "appointed by the [G]overnor" and "serve[s] at the pleasure of the [G]overnor." MCL 18.1321; MSA 3.516(321). Thus, it is to be questioned whether the Governor would employ § 3 unless he was frustrated by rejection from the House or Senate Appropriations Committee under § 393. Therefore, it does not follow "that the Legislature determined that either of these separate entities might need to transfer funds within a department in order to perform its separate duties," as the majority concludes. *Ante,* p 569.

The majority also maintains that the Legislature provided a mechanism to prevent conflicting exercises of transfer authority—"[t]he Governor may veto any board action with which he disagrees." *Ante,* p 571. This argument assumes that the board will exercise independent decision-making authority absent that suggested by the Governor. One must be skeptical about whether the board, without the unequivocal support of the Governor, would vote to transfer funds. As discussed above, the board lacks a majority to override the Governor. As a result, the requisite conflict, necessitating the Governor's veto, may never occur.

Additionally, the Legislature enacted the Management and Budget Act as a comprehensive statute in order to consolidate the laws relating to budgeting, accounting, and the regulating of appropriations. This intent is expressed in the title of the act:

AN ACT to prescribe the powers and duties of the department of management and budget; to define the authority and functions of its director and its organizational entities; . . . to codify, revise, consolidate, classify, and add to the powers, duties, and laws relative to budgeting, accounting, and the regulating of appropriations; to provide for the

implementation of certain constitutional provisions; to create funds and accounts; to make appropriations; to prescribe penalties; to rescind certain executive reorganization orders; to prescribe penalties; and to repeal certain acts and parts of acts.

Thus, 1984 PA 431 was adopted to assert exclusive control over the budget and the regulation of appropriations. Where an enactment of the Legislature indicates in the title of the act that it intends to "revise and consolidate" the laws relating to a particular subject, this expression indicates an intent to include in that act entire control over the subject matter. The act is deemed to be complete within itself. *Attorney General ex rel Fuller v Parsell,* 100 Mich 170, 173-174; 58 NW 839 (1894). As this Court stated in *Lafayette Transfer & Storage Co v Public Utilities Comm,* 287 Mich 488, 492-493; 283 NW 659 (1939):

> When a new statute covers the whole subject of an old one, adds offenses, and prescribes different penalties for those enumerated in the old law, the former statute is repealed by implication because the provisions of both cannot stand together. And a subsequent statute revising the whole subject matter of former ones and evidently intended as a substitute for it, though it contains no express words to that effect, must on principles of law as well as in reason and good sense operate to repeal the former. [Citation omitted.]

Because the Legislature intended that the Management and Budget Act occupy the entire field regarding the budget and appropriations, § 3 was implicitly repealed.

II

After a close historical examination of Michi-

gan's budget process, and more specifically the appropriation process, we reject the defendant's argument that § 3 of the State Administrative Board act stands today as an independent source of authority for the administrative board to effect the intradepartmental transfer of funds. Since 1921, Michigan has labored to develop an efficient and flexible budget process, while maintaining the Legislature's constitutionally mandated control over appropriations. In an attempt to realize this objective, the Legislature created the State Administrative Board "to promote the efficiency of the government of the state." 1921 PA 2. Section 3 granted the board broad authority to "intervene in any matter touching such functions and activities [of a state department]" and "by resolution or order, [to] advise or direct the department . . . as to the manner in which the function or other activity shall be performed . . . ." Section 6 granted the board "control over the system of state accounting and the manner of handling such work."[3]

In 1931, the Legislature curtailed the board's powers by enacting 1931 PA 6, which added the language that defendants argue authorized the board's controverted actions on May 9, 1991. After an initial clause granted the board general supervisory control over all functions and activities in all administrative entities and state institutions, § 3 provided that the board

---

[3] The majority argues that "such a conclusion [that either the budget director or the board may need to transfer funds in order to perform its duties] is consistent with the approach taken by the Legislature when the State Administrative Board was created." *Ante,* p 569. While this may have been the case in 1921 when the administrative board was created, the argument fails almost seventy years later. As is evident from the Legislature's continual and progressive diminution of the board's power, the State Administrative Board is an obsolete form of government management.

shall not have the power to transfer to any state department, board, commission, officer or institution any sum from the amount appropriated by the legislature for any other purpose, except to inter-transfer funds within the appropriation for the particular department, board, commission, officer or institution. [1931 PA 6, § 3; MCL 17.3; MSA 3.263.]

Substantially identical language was added to § 6 of the act.[4] This section significantly limited the board's appropriation power at the time of the Great Depression, when the executive branch was faced with expeditiously transferring funds in order to manage the state's financial crises. Regardless, the Legislature empowered the board to transfer funds only within a department, thus strengthening its control over appropriations.

Between 1933 and 1941, the Legislature further abbreviated the board's role in the appropriation process. In 1933, it returned budget power from the administrative board to the budget director. 1933 PA 187. Without formally amending § 6 of the original State Administrative Board act, the 1933 amendment limited the board's authority to transfer funds for building purposes. 1933 PA 187, § 9. Moreover, § 11 conferred new powers and responsibilities on the board concerning the division of the appropriations into allotments on the basis of periodic requirements of the various governmental units, but required that this be done through the budget director. Finally, § 10 continued to require that all funds be strictly used for the purposes enumerated in the appropriations acts.

In 1939, the Legislature amended § 6, changing its focus to that of the board's power to appropriate and transfer funds. The amendment also oblit-

[4] The sole difference is that the hyphen in "inter-transfer" in § 3 is omitted in § 6.

erated the board's power over the system of state accounting.[5] 1939 PA 31, § 6. Additionally, in 1948 the Legislature adopted the Department of Administration Act, 1948 (Ex Sess) PA 51 (codified at MCL 18.1 *et seq.*; MSA 3.516[1] *et seq.* until its repeal in 1984), which significantly limited the board's role in the budget process. The act empowered the Department of Administration (later renamed the Department of Management and Budget in 1973 PA 127) with many of the powers and duties assigned to the State Administrative Board in 1921. For example, the act reassigned the board's transfer power to the budget division of the new department:

> [A]uthority to transfer funds within an appropriation for a particular department, board, commission, office or institution is hereby transferred to and vested in the budget division of the department: *Provided,* That all such transfers shall be reported to and first approved by the state administrative board. [1948 (Ex Sess) PA 51, § 9.]

Thus, after 1948, as the state began employing professionals in budget and accounting matters, the board's role was reduced to advising and approving the Department of Administration's actions. The board no longer possessed independent authority to transfer funds within departments.

The 1963 Constitution further delineated the Legislature's and the executive's respective roles in the budget and appropriation process. For example, art 5, § 18 required that the Governor submit to the Legislature a budget specifying proposed expenditures and estimated revenue of the state along with general appropriation bills em-

---

[5] 1939 PA 31, § 6 stated: "Nothing in this act shall be construed to give the state administrative board control over the system of state accounting and the manner of handling such work, which shall be the function of the department of the auditor general."

bodying the proposed expenditures. Article 5, § 20 additionally required that the Governor, with the approval of the House and Senate Appropriations Committees, reduce expenditures authorized by appropriations when actual revenues fall short of estimated revenues. These provisions expressly established the Legislature's control over the appropriation process. As the convention comment to art 5, § 20 stated, the intention was to "remove[ ] any question as to the constitutionality of legislative control over general fiscal policy of the state."

The board's role in the budget process was further reduced by 1976 PA 120, which proscribed intratransfers of appropriations "which will increase or decrease an item of appropriation . . . by more than $50,000.00 in the aggregate." MCL 17.6(2); MSA 3.265(2). Section 3 permitted appropriation transfers over $50,000 only after approval by the House and Senate Appropriations Committees. MCL 17.6(3); MSA 3.265(3). The 1976 changes effectuated the 1963 Constitution's edict of legislative control over the state's fiscal policy.[6]

---

[6] The bill analyses of several departments confirms that 1976 PA 120 was intended to be, and in fact was perceived as, a general limitation of the board's authority to effect the intratransfer of funds, and as a reassertion of the Legislature's dominance in the area. For example, the Department of Management and Budget made the following observations regarding SB 1200, which ultimately became 1976 PA 120:

> [T]he bill would seriously affect the ability of State departments and the State Administrative Board (statewide elected officers) to respond to budgetary problems.
>
> * * *
>
> The language of this bill is similar to that which was initially written into the 1975-76 appropriation bills to the Legislature. . . . It differs from the earlier language, however, in that it is more restrictive in the limitation of intertransfer of appropriation items. [Department of Management and Budget Analysis of Budget Bill 1200, dated December 16, 1975.]

The Department of Labor made similar comments:

The final and definitive illustration of the Legislature's continual restriction of the board's power came in 1984 with the passage of 1984 PA 431, the Management and Budget Act, MCL 18.1101 *et seq.*; MSA 3.516(101) *et seq.* As the Court of Appeals stated, the Management and Budget Act "substantially rewrote and recodified the budgeting process in this state." 190 Mich App 272. Among the legislation consolidated in the Management and Budget Act was 1921 PA 2, the State Administrative Board act. The 1984 act consisted only of the five sections remaining after §§ 1, 2, and 3 were incorporated into the new Management and Budget Act, MCL 18.1145(4); MSA 3.516(145)(4), and §§ 6 and 9 were specifically repealed, MCL 18.1591; MSA 3.516(591). Section 393(2) of the new act provided: "A transfer of appropriations within any department for reasons other than cost and price variances from those appropriations as enacted into law shall not be made by the state budget director unless approved by both appropriations committees." In the 1976 amendment, § 6 severely limited the board's intratransfer powers. Therefore, when § 6 was expressly repealed by the creation of the Management and Budget Act, the Legislature once again severely limited, if not entirely abolished, the board's authority to effect

The purpose of this bill is to enable the Legislature to control all transfers between line-item appropriations except for longevity, insurance and retirement accounts.

\* \* \*

*The intent of the bill appears to provide the Legislature with greater control over the utilization of appropriations.*

\* \* \*

If this bill is enacted into law, *all transfer requests would have to be approved by the Legislature* which could take anywhere from four weeks to five months. [Department of Labor Analysis of SB 1200, dated December 19, 1975. Emphasis added.]

the intratransfer of funds without legislative consent.[7]

After a thorough examination of the historical struggle over the appropriation process, it is evident that the Legislature in 1984 did not intend to grant the board unbridled power over intradepartment transfers. It is ludicrous to adopt the defendant's view that the Legislature abandoned its progressive diminution of the board's appropriation power. In fact, the Legislature articulated two goals in adopting the 1984 changes: (1) "improv-[ing] legislative oversight of appropriations and strengthen[ing] the state's accounting by . . . [r]equiring timely passage of transfers and supplementals in order to provide for more timely fiscal year-end reporting," and (2) "[s]treamlining the appropriations transfer process." House Fiscal Agency Explanation Sheet, HB 5179 (H-2), May 31, 1984. Given this history, it is illogical to conclude that by repealing § 6 of the State Administrative Board act in 1984, the Legislature in-

---

[7] MCL 17.6(1); MSA 3.265(1), originally enacted in 1921 along with MCL 17.3; MSA 3.263, essentially reiterates the general grant of power to the board "to intertransfer funds within the appropriation for the particular department, board, commission, officer or institution." It is evident that § 6 was intended to further delineate and describe the "intertransfer" power briefly referred to in § 3, and to place additional restrictions on that authority. In various amendments before 1976, § 6 was modified to add strict limitations on the board's intertransfer powers. As amended through 1976, § 6 provided, in part,

> Intertransfers of appropriations for any particular department or institution shall not be made which will increase or decrease an item of appropriation by more than 3% of $30,000.00 whichever is greater, and in no case shall any item of appropriation be increased or decreased by more than $50,000.00 in the aggregate. [MCL 17.6(2); MSA 3.265(2).]

MCL 17.6(3); MSA 3.265(3) further provided that "[i]ntertransfers of appropriations for any particular department or institution in excess of the restrictions in subsection (2) may be made by the [board] *only after approval by the house and senate appropriations committees.*" (Emphasis added.)

tended to expand the board's power to effect the intratransfer of funds. Accordingly, we conclude that § 393 of the Management and Budget Act was the sole avenue for intradepartmental transfer of funds.

III

We would hold that Representative Dominic Jacobetti, as a Democratic member and Chairman of the House Appropriations Committee, had a sufficiently substantial interest in this dispute to establish standing. Furthermore, the legislative history of the budget and appropriation process, the principles of statutory construction, and common sense mandate the conclusion that when the Legislature expressly repealed § 6, it also intended to repeal § 3. Therefore, § 393 of the Management and Budget Act operated as the exclusive means to effect the intratransfer of funds within a department.

Thus, we would affirm the decision of the Court of Appeals.

CAVANAGH, C.J., and BOYLE, J., concurred with MALLETT, J.